## Case No. 7,355.

### The JOHN L. DIMMICK.

[3 Ware, 196;[1] 9 Am. Law Reg. 224.]

District Court, D. Maine. Sept., 1858.

Gen. Fessenden and D. W. Fessenden, for libellant.

Shepley & Dana, for respondents.

WARE, District Judge. This is a libel in rem., claiming extra wages, on the ground of an alleged short allowance of provisions. The libellant shipped on board of the John L. Dimmick, on the sixth of November, 1857, for a voyage from Portland to Mobile, thence to one or more ports in Europe, and thence back to her port of discharge in the United States, for wages at the rate of $18 per month. The ship arrived at Mobile on the 28th of November, and lay there, before proceeding to Havre, till the 7th of May, 1858, about six months. The first week after her ar-

---

[1] [Reported by George F. Emery, Esq.]

rival, the crew were employed in discharging her outward cargo, and in other work on the vessel; and up to this time we have no complaint of the provisions. After these services were performed, the ship remained lying at anchor in the bay, about fifteen or twenty miles from the city, waiting for freight, until the last days of March, or the first of April, a period of about four months. They were then informed that they would not further have served to them their usual allowance of food from the ship's stores, but they were to live on oysters; and these were to be procured, as it subsequently appeared, by themselves. It seems that these shell-fish are found in great abundance in that bay, and of a superior quality, and are taken with great facility. It is stated by some of the witnesses, that it is not unusual for vessels lying there to be supplied with oysters, in part, at least, instead of ordinary ship fare. From this time, for about four months, and till they began to take in cargo, according to all the libellant's witnesses, their principal food was oysters, with the usual allowance of bread, and a small quantity of flour and potatoes and turnips to cook with them. The crew went themselves, in the ship's boats, to the oyster banks to procure them, and brought them on board to the amount of sixteen or twenty barrels at a time. From this time to about the first of April, when they began to take in cargo, oysters were the staple article of their food, and nearly, if not entirely, the only article of animal food, except when the state of the weather prevented them from obtaining a supply. Then they had the usual ship fare of salted meat served out to them; once, and only once, during the four months, their table was spread with fresh meat. This was at Christmas. For at least two-thirds of the time, if not more, their food, for morning, noon, and night, was oysters, boiled with a little flour and potatoes or turnips. Three or four times during the four months they had beans, and about as many rice. Twice a week they had two small cakes baked for them, of soft bread, a specimen of which was brought into court, and one of them allowed for breakfast and one for dinner, instead of the allowance of ship bread. Most men, unless of a very quiescent temper, would have been dissatisfied with the sameness of this diet; but these men complained most of the insufficient quantity. They had not enough to satisfy the cravings of nature, and some of the witnesses say that not unfrequently they left the table as hungry as they went to it. When, for want of oysters, salt meat was allowed, it was, according to the testimony of the cook and the men, given with a sparing hand, not much exceeding half a pound a day. Twice the men went aft in a body, to complain to the captain. The first time they did not see him, though he was in the cabin. The second time they carried with them their breakfast of oysters, and

asked him if he thought it enough. He said no; but if they did not open more, he would have them called at four o'clock, instead of from five to six, the usual hour of rising.

What constitutes a full or short allowance in the merchant service, is not fixed by the law. In the want of such a rule, the courts have thought that it ought to be equivalent to the navy ration. That is fixed at one pound of meat and fourteen ounces of hard bread, with one quarter of an ounce of tea, or one ounce of coffee or cocoa, and an addition of other farinaceous or vegetable food, as rice, peas or beans, or dried fruit. It is a liberal allowance for a hearty, hard-laboring man. If the witnesses of the libellant are to be believed, the allowance to this crew was far below the navy ration. The case of a short allowance is then clearly made out, unless this testimony is overcome by that offered by the claimant. Two witnesses were examined on this point, the mate and the steward. They appeared not unwilling to give a coloring to their testimony favorable to the owners. But when fairly examined, their testimony, I think, leaves the case about where it stands on that for the libellant. The credit of his witnesses is rather confirmed than impaired, and it may be added that they gave their testimony with a degree of coolness, deliberation, and apparent freedom from prejudice and passion, unusual in such cases. It ought, also, not to be forgotten, that during the whole of this four months of short allowance, there was no insubordination; the crew were uniformly obedient and submissive, with no appearance or pretence of even disrespectful language or behavior on their part, except in a single instance towards the mate, which is the subject of another suit now pending in court. There is one part of the mate's testimony that calls for attention, as it serves, if true, to explain and extenuate any complaint of this exclusive diet on oysters. He says that before the crew were put on this diet they were consulted by him, the whole crew being present, and that they unanimously expressed a preference to have oysters rather than fresh meat. In this I think the mate must be mistaken, as all the other witnesses say, including the steward, that they never heard anything of the kind until they heard it from the mate in the court-room.

Upon these facts, the claimant has brought a libel claiming double wages, under the act of congress, of July, 1790, chap. 29, sec. 9, for the period of four months, while the crew were on short allowance. That act provides that every ship or vessel of 150 tons burthen, or more, bound on a voyage across the Atlantic, shall, on leaving her last port, have on board, under deck, 60 gallons of water, 100 pounds of salted flesh meat, and 100 pounds of ship bread, for each and every person on board, besides such other stores as may be put on board by the master or any passengers, and in a like proportion for a

longer or shorter voyage, and in default of this supply, if the crew are put on short allowance during the voyage, the seamen shall be paid double wages for the period of such short allowance. This act appears to me to bear on its face the character of a penal statute. It does not change the nature of the case that the penalty is given to the seamen. It is, therefore, like other penal laws, to receive a strict construction. The two facts of a deficient supply and an actual short allowance are connected in the act by a copulative and not disjunctive word. Both must, therefore, concur to constitute the quasi misdemeanor, which is visited with the penalty. The Childe Harold [Case No. 2,676]; The Mary [Id. 9,191]. The first inquiry then, is, was there a deficient supply on board when the ship sailed? The last port from which she sailed, before the short allowance, was Portland, and her port of destination, Mobile. Now, I think it is satisfactorily shown that the ship on sailing had as large a supply of provisions as the law requires for such a voyage. One of the facts, therefore, does not exist, which is necessary to make up the delinquency. It is true, as argued by the libellant's counsel, that if the provision is withheld from the crew, it is to them, for whose benefit the law was made, the same grievance as if the provisions were not there. Still, in the construction of a penal statute, where the law makes two acts necessary to complete the fault, it is a bold step for a court to say that it shall be completed by one. But, if this were done, there is another difficulty behind, which appears to me to be not easily overcome. The short allowance, to bring the case within the statute, must be during the voyage. Now, when was the voyage ended? Within the meaning of this act of congress, it was, I think, on her arrival at Mobile. A voyage, in the most common and familiar acceptation of the word, is the transit from one place or port to another, and I think that the meaning intended by the law-makers of this law. The object of the legislature in requiring a given amount of provisions, proportionate to the ordinary duration of the passage, was to prevent that terrible calamity, a famine at sea. This is, at least, one of the most common meanings of the word, and is, I think, its meaning in this statute. The short allowance did not commence until one week after the arrival at Mobile, and not until the discharge of her outward cargo. My opinion, therefore, is, that this libel cannot be maintained for the statute penalty. But does it follow that the seaman is without remedy for a great wrong? I think not.

This statute penalty does not, and was not intended to, affect the mutual rights and obligations of the parties resulting from the nature of the contract. What are these within its fair meaning? The seaman engages to render faithfully all the services that pertain to the navigation of the ship, and all those that are naturally or by custom incident to that duty, as the making some slight reparations of the ship in calking or painting the deck or other part of the vessel, which is occasionally required, and, also, in the loading and unloading the cargo, according to the custom of the trade in which she is engaged. But it has never, to my knowledge, been considered an incident to their general duty as mariners to occupy their time, while lying in port, in procuring provisions for the ship's use, either by fishing or otherwise. On the other hand the seamen stipulate for and the owners promise to pay the agreed wages. This stipulation and promise is embodied in the written contract. But there is always implied another stipulation and promise, though not put in writing, that provisions for the board of the crew shall be furnished by the master and owners, and that these shall be served out to them in sufficient amount and of suitable quality. This proviso is just as binding on the owners as the written promise to pay their wages. To withhold from them an adequate supply, or to furnish food that is unwholesome, or of an unsuitable quality, is just as much a fraud in the contract, as it would be to pay them their wages in clipped coin or depreciated bank bills. I am unable to see the ground on which a distinction can be made between one and the other. If it be a manifest wrong and fraud on the contract, it would be a reproach to the law not to furnish a remedy. What difficulties might present themselves in the refined and subtle technicalities of the common law it is unnecessary here to inquire. The wrong is not beyond the remedies of a court, professing, like the admiralty, to decide ex aequo et bono, on enlarged principles of natural equity and the universal justice.

The seamen's contract so obviously includes board that it may be deemed unnecessary to refer to authorities in support of this. But the old sea laws were curiously directory on this as well as on other subjects. The Conselato del Mare (chapter 145) obliges the master to give the seamen meat three times a week, that is Sunday, Tuesday, and Thursday, and wine every morning and afternoon, and to double their rations on festival days. And if during the voyage he is in want of provisions or other necessaries, and if he is without money, the ship is bound. Chapter 239. And it seems that they were purchased on the credit of the ship solely, for if that was lost the creditor lost his debt. But this is a libel in rem against the vessel, and it is argued that even admitting there is a wrong for which the seamen are entitled to a remedy, that it is one for which neither the owners nor the ship are liable; that when the owners have put on board the vessel provisions to the amount and of the quality required, if the master unnecessarily puts the men on short allowance, this is his own personal delinquency, for which he alone is responsible.

The general rule is that the owners are responsible for the acts of the master done in his character of master, and within the scope of his authority as such. "Omnia facta magistri debet prestare qui eum praeposuit" (Dig. 14, I. 1, § 5); "ejus rei nomine cujus ibi praepositus fuerit" (Dig. 14, I. § 7). This is the language of the Roman law, and the word facta, acts, include both the contract and faults or torts of the master committed in the transaction and management of the business within the legitimate range of his authority. For though faults, like crimes, are in their nature personal, and imputable only to the delinquent individual, yet, says the jurisconsult, the exercitor of a ship and the institor of a shop or store is considered as in some measure culpable for employing an unsuitable man for his business. "Aliquatenus culpae reus est, quod opera malorum hominum uteretur, ideo quasi ex maleficio teneri videtur." Dig. 44, VII. 5, § 6; Inst. IV. 5, § 3. The law of France precisely agrees with the Roman law. The 216th article of the Code de Commerce provides that the owners are civilly responsible for the acts of the captain in what relates to the ship or the voyage. "Tout proprietaire est civilement responsible des faits du capitaine pour ce qui est relatif au navire et a l'expedition." And the commentators explain the word faits— acts—as a generic term, which includes des fautes et des engagemens, faults and contracts. Emerig. Contrats a la Grosse, c. 4, § 2, by Boulay Paty. And this is in perfect conformity with the ancient and well-established maritime law of Europe. The Consolato del Mare (chapter 77) provides that the captain shall be liable for any damage done to merchandise by bad storage, and adds, that "in all damages mentioned above, and in all those which shall be mentioned in the chapters of the sea, which the ship ought to pay, the captain is bound for his part, and each part owner for his part. The ship is liable, but has its remedy over against the person who is guilty of the fault."

The law of this country, as to the liability of owners for the acts of the master, as I understand it, is the same as the general maritime law of the world. And it stands on the general principles of the law of agency. The principal is always responsible to third persons for the acts of his agent, for his faults, his acts of misfaisance or nonfaisance, committed in the transactions of the business confided to him, as well as for his own contracts. Story, Ag. § 452. It is, without question, entirely within the scope of the master's authority to direct and regulate the allowance of provisions for the crew. In doing this, he acts strictly within the limits of his powers. If he puts the crew on short allowance during the voyage, and the vessel was not, when she sailed, provided with the required amount of provisions, the act of congress determines the nature and the extent of the indemnity to the crew. They shall be allowed and paid double wages, and the penalty may be recovered with the stipulated wages. The seamen have the same remedies for both against the masters, owners, and the ship. If he puts them on short allowance in a case that does not fall within the statute, as when the vessel has been supplied with the amount of provisions required, or when the vessel is not at sea on the voyage, but lying in port, or if he provides for them food of an unwholesome or unsuitable quality, and that without necessity, it seems to me to be not only an injury to the crew in the nature of a tort or nonfeasance, as it appears to have struck Judge Betts in the case of The Childe Harold [supra], but, also, a plain breach of the well-understood terms of the contract by the authorized agent of the owners, for which they are answerable on the ordinary principle of the law of agency. And as this was an economy practiced by the captain for the benefit of the ship and owners, and at the expense of the crew, it is most equitable that the ship's owners should pay for it. The crew had not only cause to complain of the insufficiency of their allowance, but for being restricted almost exclusively to a single article of animal food, and for part of the time, one or two weeks after the oysters had, from the heat of the weather, become unwholesome, and absolutely unfit for food at all.

I allow, under the circumstances of the case, to the libellant, two months additional wages, one-half the time the crew were on short allowance. Decree $36 damages and costs.