### THE MARY ADELAIDE RANDALL.

(District Court, D. Connecticut.   March 24, 1899.)

#### No. 1,182.

SHIPPING—CHARTER PARTY—CONSTRUCTION—VOYAGE—DISCHARGE.

A schooner was chartered at the port of New York "for as many voyages as vessel [could] make from Fernandina to New York between" November 8, 1897, and June 30, 1898.   This period was ordinarily sufficient for five trips, including discharges, which were an important factor.   The vessel was to "receive on board during the aforesaid voyage the merchandise hereinafter mentioned."   The charterer engaged to furnish a cargo of ties each trip, and to pay "for the use of said vessel during the voyage aforesaid, fifteen cents for each * * * tie delivered, * * * payable in cash on proper delivery of cargo at port of discharge," and also agreed "to pay vessel's wharfage, if any [should be] incurred while discharging under this charter."   It was agreed that "the lay days for loading and discharging [should] be as follows: * * * Commencing from the time the vessel is ready to receive or discharge cargo, at least 75,000 feet per running day * * * to be furnished the vessel for loading, and customary dispatch for discharging at port of discharge,"—and that a certain sum should be paid per day for detention by fault of the charterer.   On one trip, at the charterer's instance, the vessel went up the river to Bush's Bluff, though it involved a delay.   Held, that the term "voyage" included the discharge of the cargo, and therefore the vessel was not bound to undertake a fifth trip, where she could not have completed it and have discharged her cargo by June 30th.

This is a libel by George S. Baxter & Co. against the schooner Mary Adelaide Randall, etc., to recover damages for breach of a charter party.   Dismissed.

Carpenter & Park, for claimants.
Cowen, Wing, Putnam & Burlingham, for libelants.

TOWNSEND, District Judge.   In admiralty.   November 8, 1897, libelants and claimants executed the following charter party:

"This charter party, made and concluded upon in the city of New York the eighth day of November, 1897, between J. L. Randall, master and agent for the owners of the Schr. Mary Adelaide Randall, of Port Jefferson, of the burden of 1,108 tons or thereabouts, registered measurement, now lying in the harbor of New York, of the first part, and Messrs. G. S. Baxter & Co., of New York, of the second part, witnesseth: That the said party of the first part agrees in the freighting and chartering of the whole of the said vessel (with the exception of the cabin and necessary room for the crew and the storage of provisions, sails, and cables), or sufficient room for the cargo hereinafter mentioned, unto said party of the second part, for as many voyages as vessel can make from Fernandina to New York between the date of this charter party and June 30, 1898, on the terms following:   The said vessel shall be tight, staunch, strong, and every way fitted for such a voyage, and receive on board during the aforesaid voyage the merchandise hereinafter mentioned.   The said party

of the second part doth engage to provide and furnish to the said vessel, each trip, a full and complete cargo, under and on deck, of yellow pine railroad cross-ties, sawn and hewn square on four sides, and sawn square at ends, measuring 7"x9"x8½ ft. each. Charterers have privilege of shipping smaller sizes at pro rata rate of freight, and to pay the said party of the first part, or agent, for the use of said vessel during the voyage aforesaid, fifteen (15) cents for each 7"x9"x8½ ft. tie delivered, smaller sizes at pro rata rate of freight, payable in cash on proper delivery of cargo at port of discharge, free of commission or discount. Party of the second part also agrees to pay vessel's wharfage, if any is incurred while discharging under this charter. It is understood the charterers have privilege of loading vessel at Brunswick at same rate and terms. It is agreed that the lay days for loading and discharging shall be as follows (if not sooner dispatched): Commencing from the time the vessel is ready to receive or discharge cargo, at least seventy-five (75) thousand feet per running day, Sundays and legal holidays excepted, to be furnished the vessel for loading, and customary dispatch for discharging at port of discharge; and that for each and every day's detention by default of said party of the second part, or agent, seventy-five ($75) dollars per day, day by day, shall be paid by said party of the second part, or agent, to the said party of the first part, or agent. The cargo or cargoes to be received and delivered alongside, within reach of the vessel's tackles. It is agreed that the vessel shall proceed light each trip for Fernandina, and after discharge of cargo at this port to enter upon this charter. The vessel to report to —————, at —————, for cargo. The dangers of the seas, fire, and navigation of every nature and kind always excepted. A commission of five per cent. upon the gross amount of this charter (including demurrage) is due from the vessel to A. Dayton & Co. upon the signing hereof. To the true and faithful performance of all and every of the foregoing agreement, we, the said parties, do hereby bind ourselves, our heirs, executors, administrators, and assigns, and also the said vessel's freight, tackle, and appurtenances, and the merchandise to be laden on board, each to the other in the penal sum of estimated amount of this charter.

"In witness whereof, we hereunto set our hands the day and year first above written.

"[Signed]                              J. L. Randall.
"[Signed]                              G. S. Baxter & Co."

Thereafter claimants entered upon the performance of said charter, and made four round trips. The vessel arrived at New York on the fourth trip from Fernandina on April 22d, completing her discharge May 9th, and then made certain necessary repairs, which were not completed until May 18th. Claimants claimed that there was insufficient time to make another voyage, including discharge, by June 30th, and refused to take another load of ties under the terms of said charter party. The charterers thereupon hired another vessel at an increased freight, and have filed this libel to recover $454.82 damages for breach of said charter.

The case is peculiarly complicated by several close questions of law and fact. Thus, one of the libelants states that the master of the vessel never said anything to him about not having time to make another trip before June 30th, which statement is not denied by the master. On the other hand, the master testifies, on his direct examination, as to conversations with Mr. Ferguson, another of the libelants, as follows:

"A. My conversation was, with him, that I wouldn't have time to make another voyage on the contract, and unless they would give me a different contract, that would agree to take my cargo when I got in, and pay me the same rate of freight that I had had hitherto, I couldn't think of going out again."

On cross-examination his testimony was to the same effect, namely:

"Q. Did you give them no notice that you elected to terminate your contract, or that it was impossible to carry it out? Nothing but a message over the telephone? A. I had done that several days previous. Q. To whom? A. To Mr. Ferguson. Q. What did you say to him? A. I said that it would be impossible for me to make another voyage under this contract, and if I went again I should have to have a new contract, so as to be sure that they would pay me my freight when I got back. Q. Did you ask them to do that,—to give a stipulation that, if you got back a little later, you would be paid? A. I told them that I would have to have it before I went."

These conversations are not denied by Mr. Ferguson. Again, while the witnesses practically agree that the vessel could have reached the port of New York on her fifth trip from Fernandina by June 30th, their testimony conflicts as to whether or not the discharge could have been completed by that time. Anderson, a witness for libelants, says that 35 days would be a prudent estimate of the length of time for a trip, not including the discharge, at that time of year. And inasmuch as the preponderance of the expert testimony on behalf of the libelants is to the effect that the chances were against the vessel's getting back and discharging by June 30th; and inasmuch as the average of time of previous voyages, including discharges, was about 44 or 45 days, and, if the fifth voyage had consumed the same amount, it would not have been completed by July 1st; and inasmuch as the testimony of the captain to the effect that such a voyage in April and May is ordinarily longer, owing to the condition of wind and weather, than during the preceding months, is uncontradicted, and as the testimony of claimants' witnesses is to the effect that the voyage and discharge could not have been completed until long after June 30th,—I find the chances were so far against the vessel making a fifth voyage, and discharging by June 30th, that she was not bound under said charter party to undertake said trip, provided the term "voyage" be held to include such discharge.

There is a further conflict of testimony as to the length of time occupied in the discharge of vessels; Baxter, one of the libelants, testifying that the Randall could have been discharged in four or five days, if necessary. But Bolander, who is in the employ of libelants, and has charge of unloading their vessels, testifies, on cross-examination, that it remained with the railroad company to tell how quick a cargo should be discharged, and further testifies as follows:

"Q. Did not Capt. Randall come to you repeatedly, and to Baxter & Company, with your knowledge, and ask for a quicker discharge of the Mary Adelaide Randall? A. Yes, sir. Q. Did you tell him that you were discharging him as quick as you could? If not, what did you tell him? A. I don't think we told him we was discharging him as quick as we could. We was doing the best we could. Q. Can you tell the court why it was, the very last time he was there discharging, he was sixteen or seventeen days lying there discharging? A. I don't know whether it was lack of cars, or what the difficulty was."

The average time of discharge on the four trips was 17 days, and I find this to be the time it would probably have required to discharge the vessel, had she taken the fifth trip. In view of the libel-

ants' assertions that the vessel could have been discharged in 4 or 5 days, and their admission that the discharge on these various occasions averaged 17 days, although Capt. Randall was constantly urging the necessity of haste, it may at least be questioned at the outset whether or not the alleged insufficiency of time to complete the fifth voyage, including the discharge, was not due to the inexcusable neglect of the charterer to expedite said discharges.

The controversy between the parties turns chiefly upon the interpretation of the word "voyage" in said charter party. Libelants contend that a voyage means the round trip, which terminates when the vessel reaches the port of discharge. Claimants contend that this charter party is a time contract for the use of the vessel up to June 30th, and that the word "voyage" includes, not only the time of the trip, but the necessary time to discharge the cargo.

The charter party provides for as many voyages as vessel can make from Fernandina to New York before June 30th. "Voyage" (viaggium) is defined as "a transit at sea from one terminus to another." Cohen, Adm. Law, p. 235; Rev. St. § 4511; Arn. Ins. 386. In the Standard Dictionary the word "voyage" is defined as follows: "The outward and homeward passages of a vessel taken together; the whole course of a vessel before reaching her home port." In The Martha, 16 Fed. Cas. 860 (No. 9,144), Judge Betts holds that "the voyage denotes the transit to be performed by the seamen, and it is in this sense that the term is used in the law maritime." A voyage is ended when a vessel is safely moored at her last port of discharge after a circuitous voyage. Granon v. Hartshorne, 10 Fed. Cas. 967 (No. 5,689). In The Elizabeth, 8 Fed. Cas. 484 (No. 4,361), Judge Betts says: "The voyage is ended, within the intendment of the maritime law, when the vessel is safely moored in the port of discharge, and is ready for unlading, although the seaman, by his contract, may be bound to unload the cargo,"—citing The Martha, supra; The Cadmus, Fed. Cas. No. 2,280.

Therefore, if this instrument is to be construed as a charter party for "as many voyages as vessel can make," etc., using the word "voyage" in its ordinary meaning, the judgment must be for libelants. In the absence of qualifying language, or of other circumstances indicating a contrary intention, it would be presumed that the parties hereto have used said word in its ordinary maritime sense. But I think the other expressions used by the parties indicate that it was their intention that the discharge of the cargo should be considered a part of the voyage. Immediately after the charter for "as many voyages as the vessel can make from Fernandina to New York between the date of this charter party and June 30, 1898," the libelant engages to furnish, each trip, a certain cargo, and to pay "for the use of said vessel during the voyage aforesaid fifteen cents * * * for each tie delivered, * * * payable in cash on proper delivery of cargo at port of discharge; * * * also agrees to pay vessel's wharfage, if any is incurred while discharging under this charter."

The parties have not used the phrase, "voyages from Fernandina to New York," in the sense of the mere actual transit or movement

of the vessel; for it is stipulated that it shall "receive on board during the aforesaid voyage the merchandise hereinafter mentioned." The discharge of the cargo was clearly as much a part of the charter party as the loading; for it was agreed what should be "the lay days, commencing from the time the vessel is ready to receive or discharge," and as to "customary dispatch for discharging at port of discharge," and what should be paid for each day's detention. Furthermore, as if to indicate that the charter for voyages included the discharge of cargo, the libelant agrees to pay vessel's wharfage while discharging as aforesaid.

Apart from the intention to be deduced from the language of the charter party, a consideration of the surrounding circumstances, the situation of the parties, and the object they had in view suggests the same conclusion. The time covered by said agreement was nearly eight months, a period of time ordinarily sufficient for five trips, including discharges. Inasmuch as, under ordinary circumstances, five trips, including discharges, would have been completed by June 30th, the time fixed by the parties, it is fair to presume that they fixed on that date as a time when the engagement of the parties should terminate. Again, the average time for the previous trip from New York to Fernandina, the loading there, and the return to New York, had been only 28 days; the average time for discharging was 17 days. The discharge, therefore, was the chief, the essential, element in said voyages, in determining the length of time required on each adventure, and the mutual rights and obligations of the parties in reference to taking and completing a further trip before June 30th. On the last voyage, claimants, at the request of the charterers, went up the river to Bush's Bluff, although this longer trip probably involved delay, and would have necessarily consumed a longer time, except for the fact that the charterers did not have a sufficient cargo at Fernandina.

The foregoing provisions and conduct of the parties seem to lead to the following conclusions, namely: The charter party, while in terms for "as many voyages as vessel can make," etc., was in fact and in law a time charter,—a hiring of the vessel up to June 30th, to go and come as the charterers might direct,—with an agreement on the part of the master of the vessel that it should make such voyages as the charterers ordered, provided he could have his vessel free to undertake other engagements on or after June 30th. The charter was not for "as many voyages as the vessel might make between Fernandina and New York." No compensation was earned unless, in addition to the transit between the two ports, there should be the due receipt at Fernandina and delivery at New York of a certain specified cargo. This, then, was a contract between the parties for a certain number of voyages, at so much per voyage only, for as many voyages as the vessel could make, and not for a lump sum. It was a contract whereby the charterers agreed to pay to the vessel 15 cents per tie loaded on board said vessel at Fernandina or Brunswick and delivered at a wharf at the port of New York.

An exhaustive examination of American and English authorities fails to show any case exactly in point. Mr. Parsons, in discussing

charter parties, says that, where a charter for a voyage or voyages allows the charterer certain lay days for loading and unloading, "these days for which he pays nothing are a part of the voyage." 1 Pars. Shipp. & Adm. 311. In Tully v. Howling, 2 Q. B. Div. 182, a vessel was chartered "for twelve months, for as many consecutive voyages as the said ship can enter upon after completion of the present voyage at and from Sunderland to London." Chief Justice Cockburn said:

"This case seems to my mind perfectly clear. The cases cited by Mr. Webster have no application. They were not cases in which the contract was one that had reference to a given time, or the use of the ship for a given time; and that is the essence of the present contract. The plaintiff says 'I want a vessel from a given date,' or, if you please, 'from the termination of a given voyage.' * * * The bargain is that the plaintiff is to have the use of the ship for twelve months, but the defendant is not in a position to give him the ship for twelve months from the date from which it was agreed the term should begin."

And, on appeal, the judgment of the queen's bench division was affirmed; Judge Mellish saying, inter alia:

"In other words, in a charter party for a stipulated time, is the time of the essence of the contract, or is the charterer bound to take the vessel for a time substantially different from the time specified in the charter? We are of opinion that, as in a charter for a voyage, the specified voyage would be of the essence of the contract, and the charterer, if he could not have the use of the vessel for the specified voyage, would not be bound to take her for any other voyage; so, in a charter for time, if the charterer cannot have the vessel for the specified time, he is not bound to take the vessel for a shorter time, or a substantially different time, and, if he cannot get the vessel for the specified time, he may throw up the charter."

These citations are pertinent in support of the view, already taken, that this charter is for the hire and use of the vessel for so many voyages as can be completed within a fixed time, and also as to the respective rights and obligations of the parties. Here the vessel was to be free for other charterers on July 1st. The charterer, therefore, cannot oblige the vessel to undertake another adventure, which would detain it beyond the specified time. Here it is not claimed that the delay for repairs was through the fault of the vessel. Havelock v. Geddes, 10 East, 555.

Let the libel be dismissed, with costs.