## THE PELOTAS.

District Court, E. D. Louisiana.  July 12, 1927.

### No. 17484.

1. Collision ⊜114—Charterer by demise charter may maintain suit for collision.

Charterer by demise charter of vessel may maintain suit for collision.

2. Admiralty ⊜43—Court having custody of vessel may issue process for its seizure in an independent suit by another libelant.

Court having custody of vessel in pending suit may issue process for its seizure in an independent suit by another libelant.

3. Shipping ⊜207—Suit for limitation of liability is limited to limitation for disasters occurring on particular voyage.

Owner of a vessel may petition for limitation of liability for all disasters occurring during a particular voyage, but may not include disasters occurring after that voyage has ended.

4. Shipping ⊜207—Voyage ends when vessel reaches port and is ready to discharge cargo.

A voyage is ended when the vessel has reached her port of final destination and is ready to deliver cargo.

5. Collision ⊜111—Suit against vessel for collision after end of her voyage held not maintainable by intervention in suit for limitation of liability for damages occurring during voyage.

Where a steamship had reached her port of final destination on a voyage, anchored, and was jettisoning cargo damaged in a stranding during the voyage, when she dragged her anchor during a storm, and came into collision with another vessel, the owner of the latter could not intervene in a suit by the owners of the steamship to limit liability for damage to cargo by the stranding, but might be permitted by the court to maintain an independent suit in rem therein for the collision.

6. Shipping ⊜207—Limitation of liability does not extend to claims arising after termination of voyage during which damages sought to be limited against accrued.

Where a vessel is surrendered subsequent to termination of a voyage in a suit for limitation of liability for damages occurring during the voyage, the owner is liable for all liens accruing after such termination, irrespective of

the limitation proceedings, and for any diminution in value of the vessel after that date.

### 7. Collision ⬥69—Collision between two steamships anchored off New Orleans held due to later comer anchoring too close, and allowing her anchor to drag in a gale.

Collision between two steamships, anchored in the Mississippi river off New Orleans, in a southeast gale, *held* due to the fault of the later comer, anchored below and within less than her length of the other, in that she anchored too close, and when her single anchor dragged paid out more chain, instead of dropping her second anchor.

In Admiralty. Suit for collision by the Cuyamel Fruit Company against the steamship Pelotas. On exceptions to supplemental libel and final hearing. Exceptions overruled, and decree for libelant.

Nicholas Callan (of Monroe & Lemann), of New Orleans, La., for libelant.

John D. Grace (of J. D., M. A. & E. H. Grace), of New Orleans, La., for respondent.

BURNS, District Judge. The original libel herein was filed on behalf of the Cuyamel Fruit Company of Delaware, as the alleged owner of the steamship Omoa. It prayed a recovery of damages arising out of a collision during a storm on the night of November 28, 1923, whilst she was at anchor below Algiers Point in the Mississippi river, several hundred feet off the west bank, when, it was alleged, the steamship Pelotas, also at anchor, dragged anchor and drifted into the stern of the Omoa on her port side.

[1] By supplemental libel it was alleged that the titulary ownership of the Omoa was at the time of the collision vested in the Cuyamel Steamship Company, a subsidiary of the Cuyamel Fruit Company of Delaware; that its title had been derived previously by conveyance in 1922 from a predecessor corporation, the Cuyamel Fruit Company of South Dakota; that the outstanding note representing the purchase price had never been paid; that at the time of the transfer the Cuyamel Steamship Company, Inc., entered into a charter party by which it demised and leased the Omoa to the Cuyamel Fruit Company for a period of 20 years, at the expiration of which the charterer was to return the vessel in like good condition as received, wear and tear excepted, the declared intent being to create a demise of the ship.

To this supplemental libel an exception was filed by respondent, urging that the Fruit Company is not a proper party defendant; that the supplemental libel was filed in an effort to substitute a different party. It appears, however, that this exception was abandoned. If it were not, I should be constrained to sustain the right of a charterer holding under a demise of the vessel to sue for damages by collision. 36 Cyc. 66; Leary v. U. S., 14 Wall. 607, 20 L. Ed. 756; Lake Erie & B. Steamboat Co. v. The Son & Heir, Fed. Cas. No. 7,995; The John B. Dallas (D. C.) 94 F. 695; The Beaver (C. C. A.) 219 F. 139; The Aquitania (D. C.) 270 F. 239.

By an additional supplemental libel, filed June 13, 1927, the libelant averred that on March 1, 1923, it acquired all of the assets, property, obligations, and contracts of every nature and kind of the Cuyamel Fruit Company of South Dakota.

[2] Respondent also excepts on the ground that the collision of the Pelotas with the Omoa occurred prior to the conclusion of the last voyage of the former in legal contemplation; that at the time of the seizure in this in rem proceeding there was a subsisting restraining order of this court, in a suit entitled Companhia de Navegacao Lloyd, Brasileiro (No. 17429 of the docket) 7 F.(2d) 235 wherein the owners of the Pelotas were praying for a limitation of liability, requiring all parties having any right, claims, demands, or actions against the ship for damaged cargo, or for salvage or other services, growing out of the stranding of the Pelotas on Gualliquilla reef, to make proof thereof in said proceeding; also that at the time of the issuance of process in this suit the Pelotas was in custodia legis, being in the custody of a trustee specially appointed by this court to take over the custody of the vessel from the marshal, who had seized and was then holding same in suits in rem to enforce alleged liens.

In support of the exception respondent offered in evidence the record in the limitation of liability proceeding, showing that suits had been brought against the Pelotas and her owners for sums aggregating over $1,000,000; that they asked for an appraisement, but finally abandoned her to the court, and prayed for the appointment of a trustee, who, upon being authorized, proceeded to advertise the vessel for sale; that on the evening preceding the day of the sale the libelant herein obtained the issuance of process in this suit, by which seizure was made in the hands of the trustee. It seems that this was done with the knowledge and approval of the then District Judge (Hon. Rufus E. Foster, judge now of the Circuit Court of Appeals, Fifth Circuit). Thereupon the respondent owner furnished bond for release of that seizure, protesting, however, that the libelant had no right to such issuance of process and seizure, because of the pendency of the limitation proceeding, and

that the libelant should have been required to intervene in that proceeding, with all other persons, because the voyage of the Pelotas had not ended before the collision. Respondent cites 15 Corpus Juris, p. 1140, which is to the effect that property in custodia legis will not be interfered with by another court of concurrent jurisdiction, and Wabash Railroad Company v. Adelbert College of the Western Reserve University, 208 U. S. 54, 28 S. Ct. 182, 52 L. Ed. 386, to the same effect. This seems beside the point here. In my view, the correct contention is urged by libelant, because when the seizure was made this court controlled both proceedings.

The first point to be determined is whether or not the voyage of the Pelotas had ended, because the collision occurred in the port of New Orleans, which was the ship's port of final destination, where she was anchored. The collision here had no connection whatever with the previous stranding of the ship on Gualliquilla reef. If the voyage had not yet ended at the time of the collision, the libelant would, undoubtedly, have been forced into the limitation of liability proceeding. If, on the other hand, it had ended, then it is necessary to consider libelant's right to this independent proceeding against the vessel in rem upon a seizure made while the vessel was in the custody of this court.

[3] It is settled law that the owner of a vessel may petition for a limitation of liability for all disasters occurring during a particular voyage; but it is equally well settled that he may not do so for disasters occurring after such voyage has ended. The Alpena (D. C.) 8 F. 280, 283; Benedict, art. 482, p. 574; Barge Bull, 1926 A. M. C. 889; The Great Western, 118 U. S. 520, 6 S. Ct. 1172, 30 L. Ed. 156; The City of Norwich, 118 U. S. 468, 6 S. Ct. 1150, 30 L. Ed. 134.

The Pelotas sailed from Santos on August 12, 1923, with a cargo of coffee for New Orleans, and also certain cattle and passengers for Vera Cruz and intermediate points. On September 15, 1923, she stranded on Gualliquilla reef, where she stuck fast until October 6th, when, being hauled off by salvors, she proceeded to Vera Cruz, leaving that port October 25th for New Orleans, where she arrived October 27, 1923. On December 1, 1923, the David J. Evans Coffee Company and other cargo owners filed suits for cargo lost and damaged as a result of the stranding. On December 5, 1923, the petition for limitation of liability was filed. The vessel was then surrendered to a trustee appointed by this court on December 12, 1923. A monition then issued under seal of court, citing all persons claiming damages, etc., caused by, resulting from, or growing out of the stranding of the Pelotas on Gualliquilla reef.

Now the collision with the Omoa occurred in this her final port on the night of November 28, 1923, long after the Pelotas had arrived. She had been anchored here since October 27, 1923. The respondent seeks to sustain his exception by contending that the voyage had not yet ended in contemplation of law, because the Pelotas was still engaged at the time of collision in the jettison of damaged cargo coffee, and there were still some coffee samples on board to be delivered in New Orleans. Respondent's contention appears to be contradicted in its own petition for limitation, where it is alleged that a survey had been held at Vera Cruz, when the ship was reported seaworthy to conclude her voyage, but not to carry sound cargo; that hence she left her sound cargo at Vera Cruz, and jettisoned that which was there condemned as worthless; that what remained in the hold was likewise condemned as worthless, but was continued on board to be jettisoned at New Orleans.

In the prayer the date of the end of the voyage was specifically set out: "Wherefore your petitioner prays that this honorable court will be pleased to cause due appraisement to be had of the value of the steamship Pelotas in the condition she was in upon the conclusion of the voyage in which she was engaged, which occurred upon the 27th day of October, 1923, and the value of the pending freight, if any." The appraisers accordingly made oath to make their appraisal as of that date, the same being the accepted date of the conclusion of the voyage in fact.

[4] Under the circumstances I hold the respondents to be now estopped from setting up a date other than that established by their solemn judicial declaration, upon which all succeeding steps in the proceeding were predicated. The fact that certain sample cases were delivered thereafter from on board, or that the jettisoning of worthless coffee from the hold continued after that date, cannot alter the fact that the voyage was concluded on that date. Moreover, in contemplation of law, a voyage of a vessel has been consistently recognized and defined as the sailing or passage or transit of a ship from her port of origin to her port of destination. The voyage ends when the vessel is safely moored at her port of final destination and is ready for unloading. Burgess v. Equitable Marine Ins. Co. of Provincetown, 126 Mass. 70, 77, 30 Am. Rep. 654; The John L. Dimmick, 13 Fed. Cas. 690, 691, 692; The Martha, 16 Fed. Cas. 860, 861;

The Mary Adelaide Randall, 93 F. 222, 225; The Elizabeth Frith, Fed. Cas. No. 4,361; The Annie M. Smull, Fed. Cas. No. 423.

[5] The conclusion, therefore, is that, since the Pelotas was safely anchored in the harbor and port of New Orleans, where she was to jettison her worthless cargo, her voyage was then ended, on October 27, 1923. Under the circumstances, this libelant could not properly intervene in the limitation of liability proceeding for damages growing out of the collision of November 28, 1923, whilst the vessel was in the custody of this court by its trustee. The owner has the right to limit his liability only for a particular voyage. The liability for the later collision, if any, could give rise to a subsequent lien only. Libelant's right to his lien for damages by collision could not have been divested by the mere fact that the offending vessel was in the custody of this court. There is presented no conflict of jurisdiction between courts. The whole matter is before this court, regardless of the form of the proceedings. The respondent, as owner of the vessel, is bound to accept the restrictive character of the limitation proceedings commenced in its interest. The trustee of the vessel, under appointment of this court, was holding possession as such solely for the purpose of converting the value of the owner's interest therein as of the date of the termination of the voyage, by sale, to the use and benefit of that restricted set or class of creditors entitled to participate in the proceeds; that is, those whose claims arose out of the stranding of the ship, and otherwise, during that particular voyage.

[6] In taking advantage of the privilege conferred by the statute upon the owners of vessels, because it is a privilege in derogation of common right, the owner must surrender the vessel or have it appraised free of all prior and all subsequent liens. The law seems plainly to contemplate that, where the surrender is made at a time subsequent to the actual termination of the voyage, the owner can be compelled to pay all liens accruing after that date and for any diminution in value. So that, even if libelant had proceeded by intervention, an appraisal as of date of the termination of the voyage would have been necessary, and the owner, as a condition of obtaining his decree of limitation, required to pay into court the difference between the appraised value as of the date of termination of the voyage and her value when surrendered to the trustee, as affected by subsequent events or accruing liens. Benedict, 483 and 507.

It would seem, therefore, that the ship and its owner or claimants would necessarily be liable for an injury, by collision, to third persons arising after the termination of the voyage, irrespective of the limitation proceeding. As a practical proposition, the proceeds derived from a sale in the limitation proceeding could not be diminished by the payment of liens which arose subsequent to the voyage, and upon which the proceedings were predicated, whether the claim for such damage was presented by intervention or otherwise. Nor can the fact that the trustee was in possession alter the right of libelant to proceed against the vessel. A maritime lien upon the offending ship for an injury by collision is a jus in re, a right in the ship herself, and carries with it the right to enforcement by a libel in rem by the usual proceeding in a court of admiralty. See Paxson v. Cunningham (C. C. A.) 63 F. 132. When Judge Foster indicated an intention to sustain the seizure made, though the ship was in custody of a trustee appointed by him, it is likely he intended also to authorize the trustee to enter a stipulation for its release. The voluntary act of the owners in doing so, saving their protest, of course, made such remedial ancillary action by the trustee unnecessary.

[7] These considerations dispose of the respondent's exceptions in favor of libelant. It is therefore necessary to pass to the question of liability on the merits. The steamship Omoa arrived at New Orleans from Puerto Cortez on July 7, 1923. Her cargo was discharged, after which she was anchored off Algiers Point, moved thence to a dry dock, where she remained three days, and was again brought back to the Point and anchored, with two anchors. The captain and engineer were in charge during the day. A caretaker or watchman was aboard at night, to guard the ship and attend its lights. It was not until October 27th that the Pelotas was brought to anchor at the Point. She was placed approximately 400 feet astern and downstream of the Omoa. She used but one anchor. Her full crew was aboard. The Pelotas was a much larger ship, being 450 feet long, and her freeboard rose some 15 feet higher than the Omoa, which was 270 feet long. Both ships headed upstream to the current of the river. At about 6 o'clock p. m., on November 28th, the day having been cloudy, with fresh, variable winds, the wind shifted to southeast, gradually increasing to a gale. At or about 10:30 p. m. the ships came in collision.

It is contended on behalf of the Pelotas that the Omoa no doubt broke the hold of her two anchors, whereby she drifted down on the Pelotas during a lull in the storm,

which, by the force of the storm, had been swung around against the current, causing her stern to go aground on the batture of the river bank, where she maintained her position across the current, with her bow out in the stream; the argument being frankly based on a theory that, whilst the Pelotas was stationary, with her stem stuck in the batture ashore, the Omoa must have dragged her anchors, thus permitting her to swing back and drift downstream into the Pelotas. Out of a crew of 50 aboard the Pelotas, the third officer and two quartermasters only were produced, and this theory is pieced out of their testimony, which I have carefully read and consider very unsatisfactory as a support for the theory.

Advantage is also sought to be taken of the fact that there was no crew on board the Omoa, aboard which was the lone night-watchman, and I am referred to the Stavengeren Case, No. 16,948 of the docket, where Judge Dawkins held the Omoa liable when only two Jamaica negroes were aboard, "who not only knew nothing about handling the anchors or machinery, but who had received positive instructions from the master not to touch her anchors." (See opinion on appeal, 19 F.[2d] 489.) Suffice it to say that cases vary with times and conditions. Judge Dawkins' opinion plainly recites that the river was at flood stage at the time of that collision, and the perils of navigation occasioned thereby prompted the decision that she was not then properly manned.

The testimony here satisfies me that the Omoa did not drag her anchors; that she was safely and properly held at her original anchorage; that she swung with the force of the wind against the current and upstream; that the next morning her bearing to objects on shore, when the master returned at or about 7 o'clock a. m., was the same as had been observed by him at 4 o'clock the evening preceding and before the storm. He testified: "On the starboard side we were abreast of the wharf for gasoline boats, and on the west bank that house between the trees just about abeam looking from No. 1 hatch." He further testified that, whereas the Pelotas had been 400 feet behind the Omoa before the storm, she was on the starboard quarter of the Omoa the next morning, at a distance of only 165 feet from her stern. His testimony, coupled with that of the watchman, seems more convincing than that of the three witnesses for the Pelotas, who contradict each other in several respects, more especially with reference to the grounding of the stern of the Pelotas, whereas they agree concertedly that the Omoa came down on them.

It is my deliberate opinion that the Pelotas dragged its anchor. The testimony that they paid out additional anchor chain convinces me that this would not have been done; that it would not have been thought necessary, unless the officer in charge realized that the anchor was not holding; that, in anchoring within less than her own length of the stern of the Omoa, the Pelotas was guilty of negligence, because this was not giving clear berth to the vessel first anchored above her; nor does it matter that the anchorage was selected by a river pilot. This negligence was aggravated by the paying out of 15 or more fathoms on the single anchor chain, instead of dropping the other anchor, because both vessels were naturally swinging in the same direction upstream, and against the current. I am satisfied that the Pelotas, already too close for safety, augmented the danger by paying out more chain, and that this directly fetched her into collision. The fact that she rubbed the Omoa a second time, and that she probably fetched up on the batture, or nearly so, seems to leave no doubt that it was she who was unsafely anchored, dragged anchor, and finally caused the collision by failing to drop her second anchor, paying out additional anchor chain instead. Here was a ship, 400 feet long, practically light, with a freeboard of 30 or 40 feet, presented to the wind, with scant berth, in a crowded anchorage, paying out more anchor chain while swinging in a gale strong enough to drive her, and the other vessels at anchor there, against the river current, instead of dropping her second anchor at once. She is therefore responsible for the damage.

A decree for libelant may be entered accordingly.