JAMES RIVER TRANSPORT, INC.,
as Owner of the STEAMSHIP
JAMES, Plaintiff,

v.

STEAMSHIP NASHBULK, her engines,
boilers, etc., and National Bulk Car-
riers, Inc., her owner, Defendants.

No. 72 Civ. 1768.

United States District Court,
S. D. New York,
Civil Division.

April 19, 1974.

Burlingham Underwood & Lord, New York City, by Joseph C. Smith, New York City, of counsel, for plaintiff.

Bigham Englar Jones & Houston, New York City, by Louis P. Sheinbaum, New York City, of counsel, for defendants.

OPINION

WHITMAN KNAPP, District Judge.

At approximately 10:40 P.M. on August 14, 1970 two ships collided while both were anchored in Sasebo Harbor, Japan waiting for typhoon winds—stip-

ulated to have been from the northeast at 56 knots (or greater than 60 mph)—to subside. Each ship sustained damage and seeks a declaration that the other was at fault, and that such fault proximately cause the collision. All evidence deemed pertinent by the parties has been submitted.

The facts that appear to be basically agreed upon are as follows: The *Nashbulk*, a tanker, arrived at Sasebo for repairs on August 13, and was assigned an anchorage location in the harbor by the harbor authorities. The *Nashbulk's* bell book reflects that a Japanese pilot boarded the ship at 4:56 P.M. to guide her to the designated anchorage, and that the ship dropped anchor at 5:24 P. M. While the *Nashbulk* has not preserved any record to reflect her anchorage position, her Master William E. Griffin at his deposition was able to— convincingly in our view—"eyeball" that position. That position is marked "A" on Exhibit 3C. (The Court finds that Mr. Griffin satisfactorily rejected position "B" on Exhibit 3C.) Position "A" is approximately one-quarter of a mile, or 440 yards, from shore.

In the meantine the *James*, a dry cargo vessel, had been moored at a buoy in the harbor to discharge cargo. By at least 4:30 P.M. on August 13th, the *James'* captain, John T. Ellis had, according to his testimony, been notified by harbor authorities of the impending typhoon. Accordingly he sought permission from the authorities to make the *James* more secure by moving her from the buoy to an anchorage position in the harbor. A Japanese pilot was sent aboard by the authorities to move the *James* to the anchorage they had selected, and by 11:30 A.M. on the following morning the *James* was anchored in the location chosen for her. That location is identified by the *James'* records as approximately six-tenths of a mile, or 1000 yards, from the shore; and approximately .35 or .4 miles, or 600–700 yards, to the northeast of the *Nashbulk*.

Both ships were anchored on eight shots, or 240 yards, of anchor chain. Both captains testified that they had not heaved up their anchor chains at the time of the collision. Thus it would appear that if both ships were anchored at the locations above described—only at most about 700 yards apart—and if both were swinging on their anchor chains as would be natural in the heavy winds,[1] they could have been at certain moments within a few hundred yards of each other. Had both ships dragged anchor only slightly—and each so admits—a collision would not seem at all unexpected. In any event, collide they did at about 10:40 P.M.

Each ship attributes the collision to the fault of the other. According to the *James*, the collision would not have occurred if the *Nashbulk* had not anchored so close to the beach that she became in peril of grounding and, as a consequence, had to move away from the beach. According to the *Nashbulk*, the collision would not have occurred if the *James*, which anchored later, had not boxed her in and dragged down upon her as a consequence of anchoring too close. In the alternative however the *Nashbulk* is willing to blame the collision on the typhoon.

The threshold difficulty with each party's attribution of fault to the other is that their respective anchorages were concededly designated by the Sasebo harbor authorities. Those authorities must have or should have been aware of the proximity of the *Nashbulk* to the shore, and, subsequently, of the proximity of the *James* to the *Nashbulk*. Were those distances indeed dangerously close, it would appear that the fault for that would lie with those authorities.

Captain Ellis of the *James* described the function of the authorities as follows:

"It's customary, in cases of this kind, being in inland waters, the vessel is under control of inland authorities. A

---

*1.* See *Gabouri* deposition p. 26.

vessel doesn't anchor just anywhere. Consequently, MSTS [Military Sealift Command] advised us ·that the Japanese pilot would move us to a safe anchorage. The pilot came on board and moved us to this particular position, which he deemed to be a safe anchorage in a typhoon. * * * remember, there are other ships there, so the master would never make a decision as to where he anchored. He could object to an anchorage, yes; but due to the fact that he wouldn't know how many vessels were coming in tomorrow or tonight, and that there were 3 or 4 other vessels anchored, he would accept the, under the normal circumstances, he would accept the pilot's decision as to where the vessel was to be safely anchored. After all, the pilot knows this area. That's why we have pilots." Dep. 13–15.

■ The question therefore is, can the captain of the *James* be charged with negligence for having failed to challenge the judgment of the harbor authorities? Upon all the evidence we find that he cannot.[2]

As for the *James'* attempt in turn to fault the *Nashbulk* for its proximity to the shore, the *James* recognizes that *Nashbulk* was assigned by the authorities to its location. However, *James* argues that as typhoon Wilda advanced, the *Nashbulk* should have decided that its anchorage had become unsafe, and sought a new position further from the shore.

■ This argument overlooks testimony by the *James'* captain himself that the harbor authorities had advised *James* of the impending typhoon sometime before 4:30 P.M. on August 13th. A Japanese pilot boarded the *Nashbulk* to anchor her at 4:56 P.M. that day. While the record does not reveal precisely how much earlier the authorities had chosen *Nashbulk's* anchorage, nor precisely when they learned of the typhoon danger, it is clear that at least one-half hour before a harbor pilot began to guide *Nashbulk* to her anchor, the authorities did know of the typhoon and could then presumably have changed *Nashbulk's* anchorage had they deemed it prudent to do so. No such change was advised.[3] Consequently, the *Nashbulk* had the same right as did the *James* to rely on the judgment of the harbor authorities.

We turn then to the remaining items of fault alleged by either party. Simply stated, *James* alleges that *Nashbulk* was forced to steam up on her anchor to avoid stranding on the beach, and that such forward movement—which would have been unnecessary but for *Nashbulk's* dangerous proximity to the beach —placed the *Nashbulk* in the path of the *James* as the *James* swung on her anchor in the typhoon winds.

2. Defendant cites as contrary authority *The Pelotas* (E.D.La.1927) 21 F.2d 236. In the case cited, the court found one of the two ships there involved to be responsible for the collision, in part because that ship had anchored too close to the other, and held irrelevant the fact that "the anchorage was selected by a river pilot" 21 F.2d at 240. We do not know whether a "river pilot", like the pilot assigned by the harbor authorities in this case, was someone in authority unrelated to the ship's regular crew. If he were, we would respectfully disagree that such fact is irrelevant. We note that no authorities are cited in support of that proposition, and further that to our knowledge no court has since cited *The Pelotas* for that proposition.

3. *James'* post-trial brief at p. 2 states inexplicably that it was not until the morning of August 14th that the master of both vessels received a typhoon warning from the harbor authorities. Yet the brief refers to Captain Ellis' deposition where he clearly states that he had received notice by 4:30 P.M. on August 13th.

On the other hand, *Nashbulk's* captain did testify that he also believed he learned of the typhoon on August 14th. That does not however detract at all from the pertinent fact: namely, that the *harbor authorities* must have been aware of the typhoon when they assigned *Nashbulk* to its anchorage on August 13th, since they had already so advised the *James*.

It does appear clear from the record that very shortly before the collision *Nashbulk* was in fear of grounding, because she had "nowhere to go." (Griffin deposition p. 36.) But according to her captain, *James* too felt herself in danger of grounding. Captain Ellis testified that right before the collision *James'* engines were also going ahead "to reduce the strain on my anchor chain and keep myself from going on the beach." (Ellis deposition p. 46.)

And, while plaintiff's counsel understandably soft-pedals it, Captain Ellis throughout his testimony suggests that the typhoon and not the *Nashbulk* was the cause of both ships' difficulties.

■ The court cannot make a finding that the proximate cause of the collision was the ahead movement of the *Nashbulk*.

■ As for items of fault laid to the *James* by *Nashbulk*,—aside from criticism of *James'* anchorage—they are basically that *James* should have attempted to lessen the drag on her anchor by taking on additional ballast and/or by dropping a second anchor. *James* contends that neither measure would have been reasonable. As to ballast, *James* contends such measure is inappropriate for a dry cargo vessel, and *Nashbulk* has not rebutted that contention. As to the second anchor, the expert witness called by *James* stated that in his opinion dropping a second anchor would have hampered the ship's maneuverability. Thus he noted (Gabouri Deposition 21–22):

" . . . it sometimes is a very dangerous maneuver, only that you now cut down your ability to navigate. If your anchor is foul, you are in great trouble in storm conditions, and that's usually why most masters prefer to have one anchor so they can steam on it."

The court has been shown no basis for concluding differently, and accepts the expert's opinion. We do not therefore fault the *James* for having failed to drop a second anchor. Cf. Griffin, The American Law of Collision § 156.

The court has considered the record and the authorities cited by both sides, and has concluded that the most apposite teaching is contained in *The Jumna* (2d Cir. 1906) 149 F. 171. There the court affirmed a finding that the collision had been caused by "inevitable accident", and stated the test for such finding as follows: "Could the collision have been prevented by the exercise of ordinary care, caution and maritime skill?" The court went on:

"Fault may exist, but we are unable to discover it; it is inscrutable. Where the evidence is so conflicting that it is impossible to determine to what direct and specific acts the collision is attributable, it is a case of damage arising from a cause that is inscrutable. (Cite omitted) Whether the case at bar be thus classified, or whether it be held to come within the admiralty definition of inevitable accident is not material; in either event the loss must be borne by the party on whom it falls." at 173.

■ The case at bar is in our view controlled by the *Jumna*. Given the circumstance that both ships were positioned by a third party—and that their positions were indeed perhaps too close to each other; that in addition the typhoon winds had a force of more than 60 mph; that both ships have admitted to dragging somewhat and to being in fear of grounding, we believe it appropriate to conclude that each ship must bear its own losses from the collision.

As Captain Ellis so eloquently described the collision in a letter to the *Nashbulk's* captain, it was "an unfortunate event in which we were both victimized by a typhoon which rendered ordinary human efforts fruitless, and created a situation in which the *James* herself was endangered by other vessels around her whose predicament was likewise understandable in view of the hell seas."

The complaint and counterclaim are accordingly dismissed.

So ordered.