In the Matter of the Complaint of MID-LAND ENTERPRISES, INC., as owner, and the Ohio River Company, as Demise Charterer and Bailee in Possession of Open Hopper BARGES OR 40, OR 44, OR 215, OR 248, OR 270, OR 280 AND OR 438, for Exoneration from or Limitation of Liability.

Civ. A. No. 6515.

United States District Court
S. D. Ohio, W. D.

Dec. 18, 1968.

**1358**

Lucian Y. Ray, Cleveland, Ohio, Milton M. Bloom, Gordon C. Greene, Cincinnati, Ohio, for plaintiff.

George C. Allen, Cincinnati, Ohio, E. Winther McCroom, 1st Asst. U. S. Atty., Cincinnati, Ohio, Terrence R. Murphy, Dept. of Justice, Washington, D. C., for defendant.

## FACTS

HOGAN, District Judge.

The Motor Vessel "Orco" is a towboat owned by Midland Enterprises, Inc. In May, 1967 the Ohio River Company was the demise charterer and bailee in possession of the Orco and thirteen barges, each of which were likewise owned by Midland. The barges were each about 200 feet in length and are used for the transportation of cargo. Whereas an ocean going vessel or Great Lakes going vessel has her cargo facilities within one unitary structure, the cargo facilities of an Ohio River towboat consist of barges. These barges are customarily unmanned and they were in this case.

On May 16, 1967, the Orco was pushing her tow up river. The tow consisted of the thirteen barges owned by Midland and chartered to The Ohio River Company. Also in tow was one barge otherwise owned. Twelve of the barges were loaded. Two were empty. One of the loaded barges contained molasses. The other eleven were loaded with coal. The Cincinnati Gas & Electric Company and The Ohio River Company had a transportation agreement under which The Ohio River Company was to transport coal and deliver it to the Cincinnati Gas & Electric Company—presumably here at Cincinnati or New Richmond, Ohio. Of course, a barge cannot propel itself—at the outset we note a singleness of contractual purpose in law and in fact between the Orco and eleven of her barges—they were united in carrying out a contractual obligation of The Ohio River Company which is a subsidiary of Midland.

Of recent years the United States Corps of Engineers has been constructing large and modern dams and locks at various intervals in the Ohio River for flood control, navigation, and other reasons. One of these dams is about thirty (30) miles east of Cincinnati and is named Meldahl. Another is some ten (10) or fifteen (15) miles west and is named Markland. Each has elaborate lockage facilities. Each is capable of and does hold back enormous quantities of water—maintaining a relative (with respect to natural, /at least in summer time/) high water level. The maintenance is at different levels. In other words, generally speaking, the river on the lower side of a dam is substantially lower than the level on the up-river side.

On May 16, 1967 when the Orco and her tow reached a point six (6) or seven (7) miles above or east of the Markland Dam, her pilot received a radiotelephone call from the motor vessel Tibolt. The Tibolt was a sister ship of the Orco. With its crew of twelve (12) and tow of thirteen (13) barges, the Tibolt was north bound on the Ohio River ten (10) miles below the Markland Dam. The Tibolt was in distress having sustained some damage to one of her propellers. The Ohio River at the time was at or near flood stage with a heavy flow of drift and a swift current of high water. The Tibolt requested immediate help from her sister. Her sister Orco sought mooring facilities for the purpose of tying off her tow so that she could go to her sister's assistance. The tow of the Orco, the fourteen (14) barges, was tied up or secured in some fashion—supposedly—on the Kentucky bank. We emphasize again that whatever was done or not done to the barges had to be done and was done by the Orco and her crew. A barge has neither motor nor men. It is important to note at this point that a number of the claimants in this case state and charge that the Orco personnel moored the barges and in so doing negligently failed to moor them. Among other things, the Orco is specifically charged with failing to take the steps necessary to avoid its flotilla from colliding with the Markland Dam. The Orco then

left and went down stream to aid her sister. It is also important to note that the Orco did not detach itself from its tow "for keeps". The detachment was for a purely temporary purpose. It had a clear intention to return and resume its voyage with its tow. Compare the Tug Olive L. Moore, 278 F.Supp. 260 (E.D.Mich., 1968).

Thereafter the tow of the Orco came loose from its mooring. The barges drifted down river. One of them—we know not which on this record—is accused of striking another tow near the dam and seriously injuring one of the individual claimants. A number of them collided with the lock wall of the Markland Dam and were caused to be scattered against the piers and gates. Eight barges sank. Seven were owned by Midland and chartered to Ohio. The eighth was the un-owned barge.

Our recitation of facts throughout is, of course, not a fact finding. The matter is before this Court on preliminary motions. The recitation of the facts is a correlation of them (in accord with established methods) as they appear on the *present* record when viewed *preliminarily*.

The collision damaged the dam to the claimed tune of $126,000.00. The dam is, of course, the property of the United States. The United States also claims to have expended approximately $182,000.00 to *dislodge* the sunken barges from the dam gates. The *removal* of the dislodged barges is claimed to have cost the government approximately $240,000.00.

As a result of the collision and sinking, some of the dam gates were jammed open and disabled the dam from performing one of its purposes and as a result of the water rushing through the open gates, the Ohio River fell below its critical elevation before the gates could be cleared. Due to the emergency, the government chose to remove the sunken barges itself. There was no time for such a proceeding as United States v. Republic Steel Corp., 362 U.S. 482, 80 S. Ct. 884, 4 L.Ed.2d 903 (1962). The quick change in the water level of the river is claimed to have caused considerable damage to boat harbors, manufacturing plants depending on water intake, and even to structures along the river. The structure damage is claimed to have resulted from slippage of ground at and below the usually maintained water level. The claims of such claimants amount to an excess of $600,000.00. The claims as filed therefore exceed a million. It was stated in an oral argument that the value of the "Orco"—vis-a-vis the amount of claims is substantial.

The petitioners, Midland and Ohio, having been sued in a number of courts by some claimants—one of the cases was filed in this district and division—filed in this Court a petition under 46 U.S.C. § 183 and following, seeking exoneration from liability and—(or) limitation.

The procedural steps required by the admiralty rules and the statute were properly taken. In its asserted compliance with 46 U.S.C. §§ 183(a) and 185, the position of the petitioner was and is that the "vessel" included *only* the sunken barges (which have no value) and the pending freight amounting, on a pro rata basis, to approximately $11,000.00. The ad interim stipulation in the amount of approximately $11,000.00 was approved ex parte, the deposit was made, a monition was issued as well as the customary injunction.

The United States has filed two motions. The first is a Motion To Dismiss on the grounds that the "vessel" (as the term is used in 46 U.S.C. § 185) includes the motor vessel Orco and all fourteen (14) barges; the United States therefore claims that the petitioner has failed to surrender the "vessel" as required by the statutes and that, therefore, this Court has no jurisdiction. The motion to dismiss is in the alternative—the alternative motion being for an amendment of the injunction to permit the United States to proceed outside this action against the excluded vessels in rem to recover the damage to the Lock and Dam (33 U.S.C. § 408).

The United States has moved independently that the injunction be amend-

ed to permit the United States to bring an action, in personam against the petitioners to recover the costs of removing the barges, this motion being based on 33 U.S.C. § 409 and the Wyandott Case [Wyandotte Transp. Co. v. United States] 389 U.S. 191, 88 S.Ct. 379, 19 L. Ed.2d 407 (1967).

The questions posed by these motions are as follows and will be dealt with in this order:

FIRST: What is "the vessel"?

SECOND: If there has been a lack of compliance with the requirements under 46 U.S.C. § 185, in that less than the "vessel" was "deposited"—is the defect jurisdictional?

THIRD: Is a claim of the United States based on a violation of 33 U.S.C. § 408 subject to limitation; similarly is a claim of the government under 33 U.S.C. § 409 subject to limitiation?

FOURTH: Should this last question "Third" be determined at this stage of the proceeding?

On the facts of this case the question "What is the vessel?" is janus. One face poses it in the context of "limitation"— 46 U.S.C. §§ 183–185. This "face" is dealt with in *First* below. The other "face" poses the question in the context of "damage to Government works"—33 U.S.C. §§ 408–412. This face is dealt with in *Fourth* below. As is not unusual in the legalistic, the answers differ.

## I

### *What Is "The Vessel"*

In a limitation proceeding the petitioner must, of course, surrender his "interest" in the "vessel and freight, etc." (46 U.S.C. § 185) or deposit a "sum equal to the value" at the end of the voyage during which the incident occurred. "The *liability of the owner* of any vessel * * for any *loss*, damage, or injury *by collision* or for any act, matter or thing, loss, damage * * * done, *occasioned* or incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of

* * * such vessel, and her freight then pending" 46 U.S.C. § 183. This statute was originally enacted in 1851.

■ A "barge" may be a vessel 46 U.S.C. § 183.

■ The question of what constitutes "the vessel" has plagued the American admiralty courts for years. It has arisen in many and varied factual backgrounds. All the cases are authority for the proposition that each case must be decided under its own "facts".

Under many and varied factual circumstances the courts have held that a Sec. 183–185 statutory "vessel" includes two or more components, each of which is a de facto, or by definition, vessel.

Distinction is made in the cases between a "consensual situation" and a "pure tort" situation in concluding whether the "offending vessel" is a single one or a unitary aggregate of two or more. The Supreme Court in Sacramento Nav. Co. v. Salz, 273 U.S. 236, 47 S.Ct. 368, 71 L.Ed. 663 (1926) said "The distinction seems plain. There, (Liverpool, Brazil & River Plate Steam Nav. Co. v. Brooklyn Eastern Dist. Terminal, 251 U. S. 48, 40 S.Ct. 66, 64 L.Ed. 130, 1919), the libel was for injury to a ship in no way related to the flotilla. It was a pure tort; no contractual obligations were involved; and the simple inquiry was, What constituted the 'offending vessel'? Here we must ask, What constituted the vessel by which the contract of transportation was to be effected? A very different question."

■■ In its simplest form it is stated that, in a pure tort situation—i. e. one in which there is no contractual relationship between the offender and the person or persons injured—then, the "offending vessel" is the *one* which really caused the damage (Liverpool). On the other hand where there is a contractual relationship the search need not be reduced to one but only to those two or more actually engaged in carrying out the contract. For example (of the latter situation) A contracts with B to dredge B's harbor. A dedicates to the performance a dredge

and a tug and a barge and while all three are in the harbor at work, the tug knocks down B's dock or sinks B's vessel; in such a situation the socalled "flotilla" rule is invoked and to limit A must surrender all three of his ships as the "vessel". They are joined into one, so say the books, by "consensuality". See for instance, Sacramento Nav. Co. v. Salz, supra; Benedict on Admiralty, 6th Ed. Para. 495; Lake Tankers Corp., 132 F. Supp. 504 (S.D.N.Y., 1955); Deep Sea Tankers v. The Long Branch Petition of, 258 F.2d 757 (2nd Cir., 1958)

The "flotilla" doctrine has been idealistically strained so as to be invoked based on the "contractual relationship" between master and servant. For example, A owns a barge and dredge engaged in a unitary task during which an employee of A working on the barge is injured. Standard Dredging Co. v. Kristiansen, 67 F.2d 548 (2nd Cir., 1933)

█ Our review of the "flotilla rule" cases leads us to these conclusions. It is frequently invoked with success in a factual situation involving a contractual relationship between the owner and the injured party. It is recited "eo nomine" as a reason for refusing to require surrender of more than one "de facto" vessel in pure tort situations. It does not mean or require that the search for the answer in a pure tort situation must be continued until it has been reduced to a de facto one. "Liverpool" itself, relied on strongly by petitioners, decided in a pure tort situation that, in a situation in which a tug pushed a barge into the vessel of the injured party, the surrender required was of the tug and not the barge. The "vessel" which actually struck the claimant's ship, i. e. the barge, was not the "offending" vessel—the tug was. This because "in rem" only the *active* component, the tug, would be answerable for the tort; as the Supreme Court said "for purposes of liability, the passive instrument of the harm does not become one with the actual responsible vessel by being attached to it."

Shortly after the Supreme Court decided Liverpool, it denied certiorari in

The Alvah H. Boushell, 38 F.2d 980 (4th Cir., 1930), 281 U.S. 743, 50 S.Ct. 349, 74 L.Ed. 1156. A owned two tugs committed together to tow a steamer to a given spot. The master of Tug One was in charge of the operation (i. e. his orders controlled both Tug One and Tug Two). Tug One had cast off from the ship and was pulling astern when the ship in tow, owned by the petitioners, was damaged by a collision with some barges. At the time of collision, the ship was in the sole tow of Tug Two. The surrender of both tugs was required. The case is a consensual one.

The decision was not based on consensuality. The court held that "where both vessels had a common ownership, acted under the direction of a common master, and both participated in the towage service, there is no serious question, in our judgment, as to the existence of liability on the part of both vessels". Liability was attributed to both tugs (the passive one attached and the active one detached) on the ground that the detached one owed a "duty required of it by law to exercise the proper precaution for the protection of shipping placed under its control, and to safely conduct the same to its destination".

In Thompson Towing & Wrecking Ass'n v. McGregor, 207 F. 209 (6th Cir., 1913) a steamer had gone aground. She engaged a contractor to re-float her and that contractor undertook to do so and in the process employed a lighter and other vessels, one a tug, M, which had placed the lighter in place and detached itself. The M was soon to take her (the lighter) away. A boiler in the lighter blew up injuring a crewman-employee of the common owner. The surrender was of the lighter. The court required the additional surrender of the tug. While this case might be viewed as consensual if the damage had been to the grounded ship, there is nothing on which to base consensuality with respect to the injured employee except a fiction. The Sixth Circuit did not rest its decision on consensuality—the nub of the decision was "the utter dependency" for her

movements by the lighter on the tug. The temporary "detachment" of the tug was swept aside by the court because of the "animus revertendi" saying "the particular feature * * * constantly to be borne in mind here is the mutual dependance of [tug and the lighter]". At no point did the court rest its decision on "consensuality". Neither it—nor any employee relationship—was mentioned. In Kristiansen, the court said of Thompson Towing that "it is the only instance * * * in which the injured party has sought to hold a vessel, separated from that on which the injury took place". Thompson Towing was cited with approval in "Liverpool".

We have carefully examined these cases:

(1) The Hector, 24 How. 110, 65 U.S. 110, 16 L.Ed. 591 (1860)

A strict tort case.

(2) The San Rafael, 141 F. 270 (9th Cir., 1905)

If consensual, it could be so with only considerable straining—in any event the decision was not based on it.

(3) The Columbia, 73 F. 226 (9th Cir., 1896)

A hybrid.

(4) The Cleveco, 154 F.2d 605 (6th Cir., 1946)

Again based not on consensuality (it was present) but solely on "except for the unseaworthiness of the tug the barge could have reached safety of her port * * * the liability of the shipowner to respond in damages for the loss of life in the sinking of the tug carries with it the like liability for the loss of life resulting from the sinking of the barges * * * the tug and barge were a single unit, a flotilla, and properly considered as one vessel for the purpose of the voyage".

(5) The Bowling Green, 11 F.Supp. 109 (E.D.N.Y., 1935)

(6) The Australia Star, 172 F.2d 472 (2nd Cir., 1949)

A strict tort case in which the court said "when two vessels of the same owner contribute to a disaster, the owner may not limit liability without surrendering his interest in both his vessels".

(7) The George W. Pratt, 76 F.2d 902 (2nd Cir. 1935)

A tort case.

(8) Petition of Western Transportation Co., 194 F.Supp. 834 (D. Oregon, 1961)

A strict tort case.

(9) Petition of Lake Tankers Corp., 1955 A.M.C. 55 (S.D.N.Y., 1955)

We conclude from that examination that where two or more vessels, owned by the same owner and operated by the same operator are on a common voyage; where only one has a captain and crew and power; where that one (a tow-boat) has complete domination and control over the others (barges); where the others (barges) are utterly dependant for starting, stopping, landing or sailing on the one (the tow);—under such circumstances the "master vessel" —the tow-boat—is *as one vessel with each* of her minions—is the vessel into whose (the tow boats) hands "the passive instrument"—"The Liverpool", page 52 —each barge is placed *for the duration of the voyage* (or until earlier relief by another such active master boat). She, the tow-boat, is responsible for her own negligent actions whether the result be inflicted by her bow or by the side of one of her minions and is responsible for the misdeeds of her children during their common voyage. It is here so determined.

In Liverpool, while the barge was "attached" to the tow, a temporary detachment does not alter the rule. The search is for the *active* master. It makes no difference that the barge or barges were detached *by* the *active* master. The voyage of the composite had not ended. It was merely temporarily suspended.

The surrender of a detached master, active component vessel, has been required by admiralty courts in strict tort

situations or held to answer without reliance on consensuality, but only on the "parens" theory. See The Australia Star, supra; Thompson Towing, supra; The Alvah H. Boushell, 38 F.2d 980 (4th Cir., 1930) cert. den. 281 U.S. 743, 50 S.Ct. 349, 74 L.Ed. 1156; *Kristiansen*, supra; Petition of Western Transportation Co., supra.

As a matter of principle, we see no difference between these two things:—

(1) Orco, with one barge in tow, negligently pushing that barge at full "steam" (full Diesel perhaps more accurate) against the Markland locks—*The Liverpool* situation—in which the court held the "active" participant to be the tow—the Orco.

and

(2) Orco, with one barge, negligently (if such be the case, and that at least is the claim) leaving her barge for temporary purposes, with an animus revertendi (see *The J. Lewis Moore*, supra, and of The Bordentown, 40 F. 682 (D.C.N.Y.—89)) en voyage poorly moored to be propelled by wind and current against the Markland locks.

In either case the "dumb barges" cannot resist the force that her active master has put her to. Certainly, assuming the speed of the Orco and the current to be the same, in both cases the result to Markland is the same.

The conclusion on this first question is that the Orco is included within the term "vessel" as used in 46 U.S.C. §§ 183 & 185 as applied to the "facts" as we must take them at this stage. She is the "offending vessel".

▮▮▮ With respect to the six undamaged barges not surrendered or stipulated, in the independent and humble view of this court the balancing of interest, as applied to river traffic in this day and age when the barge has become and is the "transportation storage capacity" of a tow boat (instead of another deck or another hold), would require the same conclusion. As long ago as 1960, barge tonnage on the Ohio River far exceeded the tonnage through the Panama Canal—and the growth since has been astounding. But, in our view this District Court is bound on that "other barge" question by the Supreme Court decision in Liverpool. If any change in the Liverpool doctrine should come by reason of the changed factual (over-all) situation today vis-a-vis 1919 on our rivers it should come in the ordinary course of judicial procedure. It is therefore here determined, based on Liverpool, that the six undamaged barges (and/or their freight) need not be surrendered, as constituting components of the "vessel". In other words, it is held that the six barges are not included within the term "vessel" as used in 46 U.S.C. § 183. That is not to say that the six barges is/are not (a) "vessel(s)" within 33 U.S.C. § 412.

## II

### *Jurisdiction*

▮▮▮ The United States urges that the failure of the petitioners to transfer the Orco (or deposit her value) within the six month period is a jurisdictional defect and that, therefore, this limitation proceeding should be dismissed (46 U.S.C. §§ 183, 185). In Black Diamond S. S. Corp. v. Robert Stewart & Sons, 336 U.S. 386, 69 S.Ct. 622, 93 L.Ed. 754 (1949) in a situation in which the ad interim stipulation was substantially deficient, the District Court on so concluding dismissed on the jurisdictional ground. The Court of Appeals affirmed, United States v. Robert Steward & Sons, 167 F.2d 308 (2 Cir.), the Supreme Court reversed—

"And perhaps it is well to add, in passing, in view of the six-month limitation (4285) on proceeding under that statute, remand to the District Court in order to give Black Diamond an opportunity to file a larger bond would have been a better course, since the defect was not jurisdictional, than affirmance of dismissal."

Such is the course usually followed by the admiralty courts in similar situations.

**1364**

United States Dredging Corp. v. Krohmer, 264 F.2d 339 (2nd Cir., 1959) (a "quasi" consensual situation involving surrender of additional vessels); Petition of Western Transportation Co., supra (a strict tort case); Brown & Root Marine Operators v. Zapata Off-Shore Co., 377 F.2d 724 (5th Cir., 1967) (a consensual case); United States Dredging Corp. v. Krohmer, 264 F.2d 339 (2nd Cir., 1959) (a quasi consensual case).

This Court has jurisdiction and it is so held. The motion to dismiss will be overruled. Of course, if the petitioners fail to comply with the provisions of the Order entered this date (i. e., fail to surrender the Orco and her freight, or deposit or stipulate the value thereof) these proceedings will be dismissed.

### III

### Are Liabilities Under 33 U.S.C. § 408 and 33 U.S.C. § 409 Limitable

408, originally passed in 1899, makes it unlawful for any person to injure a United States installation, such as Markland Dam. The United States has successfully maintained in personam and in rem admiralty actions to recover the cost of repair to such properties injured by vessels—all without regard to whether any negligence was involved in the damaging. Hill v. George Engine Co., 190 F.Supp. 417 (E.D.La., 1961) (and cases therein cited—in personam—no negligence shown); United States v. The M/V Martin, 313 F.2d 851 (7th Cir., 1963) (in rem—no negligence shown); United States v. The Republic, 64 F.Supp. 373 (S.D.Tex., 1946) (in rem—no negligence shown); United States v. The Terry E. Buchanan, 138 F.Supp. 754 (S.D.N.Y., 1956) (in rem—no negligence shown).

Strangely enough, the question whether a liability under 408 is limitable under the Statute of 1851 (as amended) (46 U.S.C. § 183 et seq.) appears an open one insofar as the reported cases are concerned. The petitioners, pointing to the broad "any loss, damage * *

done, occasioned or incurred" in the limitation statute, contend the liability is limitable. The petitioners also rely strongly on The Stonedale, 2 W.L.R. 1075 (1954), (aff. H.L.—1955, 3 W.L.R. 203 intimating that a liability for structural damage to a Government property is included within the term "damage" as used in the Limitation Statute.

The United States claims the statute inherently protects the sovereign and, as a matter of public policy, a liability to a sovereign (as such—as distinguished from a sovereign engaging in a nongovernmental function) is not limitable. The United States claims at least a right to proceed in rem against such of the "flotilla" as is not surrendered.

Section 409, passed originally in 1899, (known as the Wreck Act) requires a number of things. For example, it requires the owner of a vessel sunk in a navigable channel to "mark it" and makes it unlawful not to do so—this, of course, is at least for the protection of other vessels later using the channel. It also requires on its face the owner immediately remove the same, and continues that on his failure so to do the same may be removed by the United States.

Only relatively recently has it been determined that, if the United States effects the removal, it may recover in personam from the defaulting owner—at least if the sinking was with or by the owner's (as distinguished from the crew's?) negligence. Wyandotte Transp. Co. v. United States, 389 U.S. 191, at 205 and 210, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). Since Wyandotte is but an infant, vintage-wise, it is not strange that there is no reported case law on the question whether an in personam responsibility under the "removal" portion of 409 is limitable. If the removal responsibility requires "owner" as distinguished from "master and crew" negligence, there is not much problem. If the removal responsibility may rest on the "master and crew"

negligence, the "limitability" question looms large. We are not at all certain that *Wyandotte* has settled that basic problem.

In any event, the United States contends that a liability under the Wreck Act is not limitable for two reasons: (a) the voyage was ended when the barges sank and one may not limit against a liability incurred after the end of the voyage. The Pelotas, 21 F.2d 236 (E.D. La., 1927). In our view, the *Pelotas* is inapposite on its facts—our voyage is the voyage of "The Orco" and it was still "en voyage" when the liability under 409 arose. (b) It is a statutory liability, again to a sovereign (as sovereign) and not a "damage or loss" as the terms are used in 46 U.S.C. § 183 et seq.

There is considerable authority for the simple statement that a liability imposed by a failure to perform "statutory duty" is not limitable, e. g., "Damage or injury caused by the failure to comply with a statutory duty may deprive the owner of his right to limit, etc." Gilmore & Block, Law of Admiralty, p. 679 (Note). The cases so stating arise on factual situations which make the statement questionable. Generally the factual situations involve failure to mark, knowledge and negligence by the owner (per se and not per alium) and injury to a third party claimant resulting from a subsequent collision. In re Berwind-White Coal Min. Co., 80 F.Supp. 125 (S.D.N.Y., 1948); Eastern S. S. Corp. v. Great Lakes Dredge & Dock Co., 256 F. 497 (1st Cir.); The Snug Harbor, 53 F.2d 407 (E.D.N.Y., 1931); United States v. Eastern Transp. Co., 59 F.2d 984 (2nd Cir., 1932).

In view of the fact that these cases involve owner (per se) negligence, the limitation question was really not involved—since, present owner-per-se-negligence, no liability is limitable (48 U.S.C. § 183, "without the privity or knowledge of [the] owner" is a sine qua non of limitation).

The Petitioners point to The South Shore, 29 F.2d 207 (D.C.N.J., 1928), af-firmed 35 F.2d 110 (3rd Cir., 1929); and The Central States, 9 F.Supp. 934 (E.D.N.Y., 1935). In the latter case the question involved a liability imposed by a New York statute on the owner of a sunken vessel to remove it. The State was forced to and did. The Court held the obligation a limitable one—i. e., within the term "any damages or loss" within 46 U.S.C. § 183. The latter case involved the owner's right to limit against a claim by a city for the cost to the city of performing the owner's § 409 duty. The Court also held the removal cost within the term "any loss or damage" as used in 183. Neither case presents the problem in the instance or on behalf of the "sovereign," and neither presented the problem when the owner's in personam responsibility under 409 was clear. Cf. *Wyandotte*, supra (decided years later).

It, thus, appears that the questions swirling around 33 U.S.C. §§ 408 and 409, vis-a-vis 46 U.S.C. § 183, are, if perhaps not novel, certainly uncertain in answer.

*IV.*

*Should These Questions (III) Be Decided at This Stage of the Proceedings*

 First—it seems settled enough that in a limitation proceeding, if the decision ultimately be that *no* limitation may be had *at all* (because of the privity or knowledge of the owner per se, or for some other reason) an admiralty court may—

a) Dismiss the proceeding, *The Snug Harbor,* supra

or

b) As an equity court proceed to dispose of the cause in personam as between the petitioner and the various respondents.

As Mr. Justice Roberts said in Spencer Kellog & Sons v. Hicks, 285 U.S. 502, at 512, 52 S.Ct. 450, at 453, 76 L.Ed. 903 (1931):

"What was the duty of the admiralty court after it found the circumstances

did not permit of limitation of liability? * * * we think that the admiralty court, having taken jurisdiction and brought all claimants into concourse, should have given *complete* relief." (Affirming *in personam* judgments made after the referred-to finding.)

See also:

Just v. Chambers, 312 U.S. 383, 668, 61 S.Ct. 687, 85 L.Ed. 903; The City of Norwich, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134; Hartford Accident & Indem. Co. v. Southern Pac. Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612.

See also:

The Smith Voyager, 295 F.Supp. 857 (S.D.N.Y., 1968)

 Such being the case, it is only logical to determine that if, in a limitation proceeding, an admiralty court should determine that certain claims (such as, 408 or 409 claims) could not legally be "limited" to the "vessel," such a court could render the required relief, if such claims be established, i. e., render in personam judgments in respect of such established claims. As Judge Tenney put it in Petition of A/S J. Ludwig, 268 F.Supp. 682, at 689 (S.D.N.Y., 1967):

"I am not unmindful of the broad equity powers of this court and a shipowner petitioning for limitation subjects itself to the court's full equitable powers in that proceeding."

 While the Supreme Court has stressed that the determination of "what is the vessel" is "threshold—and should be disposed of before any" other question, *Black Diamond*, supra, the same Court has indicated that other questions involved in a limitation proceeding are better dealt with on the merits. *Hartford*, supra. The Fifth Circuit, in J. Ray McDermott & Co. v. Hunt Oil Co., 262 F.2d 127 (1959), has flatly held that "the admiralty court may not, in a preliminary way and upon motion determine the question of limitation." The same principle should, on reason, apply to questions of "limitability" of this, that

or the other claims. And with good reason—for instance, the claimants (or respondents) have placed in issue questions of seaworthiness and negligence with "the privity and knowledge of" the petitioners—if such be the ultimate fact findings, the required conclusion against "limitation" would render a question of the limitability of a given claim moot.

There is perhaps another reason for awaiting the merits. These questions should be dealt with on today's facts—fully developed at a merit hearing. There is, obviously, a paucity of "Ohio River" reported "law" on a number of questions in this case, as we have seen. They arise in a "today" context. Today's context is excellently portrayed in a "fact packed" article by the reliable reporter Graydon DeCamp, titled "Serious River Accidents Increasing With Traffic." (Cincinnati Post-Times Star, 12/3/68.) One quote: "Since 1/1/66 more than 75 barges have sunk in the Ohio. Since 1960, more than 150 have gone down in the river's lower half alone." We leave the point with reference to the recent efforts directed by the Governors of Ohio, Kentucky, Indiana and West Virginia to obtain river traffic—efforts directed throughout the world.

We, therefore, determine to pass the Third Question(s) to the merits. F.R. Civ.P. 12.

 Before approaching an "Order," one matter remains—that being the motion by the United States for leave to proceed in rem against the six recovered barges. In petitioners' complaint we find this, "the tow was torn loose, to drift down river and *collide* with the lock wall of Markland Dam, whereupon *they* were caused to be scattered against the piers and gates. Eight sank—" The respondent's answers and claims flatly state that "the *adrift and sunken* barges caused damage to Government and other property." At *this stage* of this proceeding, it could be stated preliminarily that the damage to the Government works ($182,000.00 to dislodge the barges and $126,000.00 to repair the dam) may have

been the result (composite) of the dam being struck by all 14 barges, the eight sunk and the six recovered.

As we have seen, § 408 (33 U.S.C.) makes it unlawful for any person to injure in any manner or impair the usefulness of any work built by the United States, like the Markland Dam. § 412 (33 U.S.C.) while requiring "knowingly" in respect of some acts, and "willfulness" in respect of others, flatly concludes that "*any * * * vessel * * *, or other craft used or employed in violating* [*Sec.*] *408 * * * shall be liable * * for the amount of the damages done by*" *such vessel or craft.* It would, therefore, appear that, if the facts are as claimed by the United States, the recovered barges would be "in rem" responsible. See United States v. The M/V Martin, 198 F.Supp. 171 (S.D.Ill., 1961), aff. 313 F.2d 851 (7th Cir., 1963), in which it was held in a *Liverpool* state of facts (excepting that the damage was done to a Government work instead of non-consensual private property) that *both* the pushing tug *and* the pushed barge were the "vessel" within the meaning of that term in "408–412."

It is, therefore, determined that the motion of the United States for leave to proceed in rem against the six barges is well taken. However, to simply grant it would not pay heed to the teachings of *Black Diamond,* supra and *Hartford Accident & Indem. Co.,* supra. See particularly Mr. Justice Frankfurter's language at page 398 of 336 U.S., page 629 of 69 S.Ct. of Black Diamond:

"* * * the choice of law presents a knotty problem and we cannot overlook the contingencies of appellate review. If the District Court should find Belgian law controlling, it might, under our interpretation of § 4285 exact a bond of only $325,000.00. If, however, a contrary view should ultimately prevail, the requisite amount of the bond would have been $1,000,-000. The District Court therefore, should provide for that contingency

by requiring Black Diamond to post a bond for the value of the ship and freight, not because § 4285 demands it, but as an exercise of its power to preserve the status quo pending appeal." Cf. on the point Petition of Western Transportation Co., supra.

All of the parties to this multi-cornered controversy are "in concourse" here. Jurisdiction to deal finally (at the District level) with all the questions which have or may arise is here. At least an effort should be made to satisfy the basic purpose by keeping it that way.

## ORDER

### A.

The motion of the United States is denied at this time, i. e., the motion to dismiss.

### B.

The petitioners are directed to:

a) Transfer, for the benefit of the claimants, the Motor Vessel Orco and deposit a sum equivalent to the difference between her value as of the end of the voyage on or about May 16, 1967 (cf. *The Pelotas,* supra) and now

or

b) Deposit a sum equal thereto (i. e., her value as of the end of said voyage).[1]

### C.

In the event petitioners fail to do so, on or before January 18, 1969, the complaint of the petitioners will stand dismissed as of that date at the costs of petitioners, and the motion of the United States to dismiss will stand granted as of that date.

### D.

The petitioners are directed to surrender the barges O.R. 35, 69, 168, 216, 271 and O.R.G. 3524 and deposit a sum equivalent to the difference between their value as of the end of the voyage on or about May 16, 1967, and their present

---

1. or stipulate, Admiralty Rule F.

value; or deposit a sum equal to their then value—the surrender or deposit to be made on or before January 18, 1969.[1] In the event of the petitioners' failure to so surrender and/or deposit, the motion of the United States for leave to proceed in rem outside this action against such vessels (barges) in respect of the dislodgement and repair claims (without prejudice to the continued assertion of those claims in this proceeding) will stand granted and the injunction entered herein on September 12, 1967, will stand modified accordingly.

So ordered.

---

1. or stipulate, Admiralty Rule F.