**Complaint of COOK TRANSPORTATION SYSTEM, INC., a corporation, et al.**

**No. C–75–453.**

United States District Court, W. D. Tennessee, W. D.

Jan. 15, 1976.

---

438

James E. Blount, III, Thomas R. Prewitt, F. C. Sewell, Jerome Rosengarten, Virgil A. Minor, Warner Hodges, Troy L. Henderson, Palmer E. Miller, Paul W. Denton, Memphis, Tenn., for claimants.

Carroll C. Johnson, Memphis, Tenn., for Cook Transp. and Cook Industries, and Upper Mississippi Towing Co.

Jerome T. Stauffer, Memphis, Tenn., for the Pillsbury Co.

Edward P. A. Smith, Memphis, Tenn., for Cook Industries & Bayside Warehouse.

John I. Houseal, Jr., Memphis, Tenn., for Cook Industries, Bayside Warehouse, Cook Transp. and Cook Grain Co.

Joe D. Spicer, Memphis, Tenn., for Destrehan Board of Trade Laboratory, Inc.

## MEMORANDUM OPINION

WELLFORD, District Judge.

Complainants have filed a complaint for exoneration from, or limitation of liability, a stipulation of value, and a motion for notice under 46 U.S.C. §§ 181–185 and Rule F of the Supplemental Rules, Federal Rules of Civil Procedure, dealing with asserted admiralty and maritime claims. Pursuant to the Court's order, a special hearing was set for an opportunity for the many interested claimants to be heard who have filed suits in Tennessee state courts growing out of a fire and/or explosion in or about un-

loading and plant facilities of the Pillsbury Company on President's Island, Memphis, Tennessee. Many serious injuries occurred with respect to this tragic occurrence within the City of Memphis, on or about May 22, 1974. The essence of suits filed by and on behalf of injured workmen in Shelby County Courts, beginning in April of 1975, has been a charge that Cook Transportation System, Inc. (herein "C.T.S."), Cook Industries, Inc. (herein "Cook"), Cook Grain Co. (herein "C.G.C.") and Bayside Warehouse Co. (herein "Bayside") were negligent in allowing foreign metal objects or matter to mix with excessively dusty soybean grain shipped in Barge CKI 388 owned by Upper Mississippi Towing Corporation (herein "UMTC") that had negligently not been properly cleaned, cleared and inspected and was defective and unfit.

It is asserted in the complaint that the said barge was, on or about April 23, 1974, loaded with soybeans from Bayside's facility at Reserve, Louisiana, and that shortly thereafter it was transported on the Mississippi River to McKellar Lake, contiguous to the river at Memphis, and spotted at the Pillsbury grain facility there. The barge was owned by UMTC and the soybeans by Cook and/or C.G.C.; they were to be temporarily stored by Pillsbury for further shipment to Cook in Marks, Mississippi. The claimants further charge the Destrehan Board of Trade Laboratory (herein "Destrehan") in Louisiana with negligent inspection and certification as to quality and condition of the soybeans and the barge prior to loading and unloading the 35,000 bushel shipment.

The violent explosion allegedly occurred on the day after the barge was spotted by UMTC which, under direction from C.T.S. and/or Cook, towed the barge from Louisiana to Memphis. The barge was partially unloaded by Pillsbury employees, and the explosion took place in a conveyor system, including metal belt buckets, carrying the unloaded soybeans from the dock into a silo, a part of the Pillsbury facility, for weighing.

Complainants CTS, Cook and UMTC allege in the action under consideration that the accident and damage in question was occasioned due to no fault on their part, and that it occurred without privity or knowledge on their part. Third party actions in the state court suits have been instituted against Pillsbury and Destrehan. The barge was a steel-hulled river barge with no independent means of power. It is also alleged that C.T.S. and Cook were "demise charterers" of this Barge.

All of the jurisdictional requisites of Rule F were asserted in the filing of the Complaint in less than six (6) months after claims, the tender in Court of the barge or appraised value of $40,000, plus $4,140 of soybeans yet unloaded and the prayers for relief based on facts asserted as to exoneration and/or limitation of liability. Claimants, however, have responded, instituted discovery, and have moved to dismiss the complaint as to all three complainants on the following bases:

1. This is not a proper case of admiralty or maritime jurisdiction;
2. Denial that C.T.S. or Cook is a "demise" or bareboat charterer; and
3. Value of the towboat vessel which towed the Barge should be added to the stipulation of value.

Additional facts have been brought to light at or before the hearing on the motions to dismiss. There is apparently no dispute but that UMTC is the owner of the barge. The barge charter agreement dated 12/1/73 was between UMTC, a Minnesota Corporation, and C.T.S., a Delaware Corporation, with its principal office in Memphis. UMTC, for valuable consideration, was to deliver the barge to C.T.S. free from lien and in a seaworthy condition. "Delivery" and "possession" were made over to C.T.S., which was obligated to return in "as good running order . . . ordinary wear and tear excepted" with a qualified marine surveyor to inspect at the beginning and end of the approximate four (4) year term. C.T.S. was to maintain hull insurance to a minimum value of $40,000 naming C.T.S. and UMTC as their interests may appear, but C.T.S. was to indemnify UMTC from

"any and all loss or damage of or to the barge . . . excluding liability at law of UMTC . . . as a tower." "All necessary maintenance and cleaning for the barges during the Charter term shall be arranged by UMTC for the account of Cook, provided that UMTC shall be responsible for one-half the cost of all ordinary maintenance, excluding cleaning. Cook shall be solely responsible for keeping the barges in a clean and safe condition, including the cleaning of meal or other commodities off the decks which are detrimental to the life of the barge or the safety of crews."

Cook was further under the charter to be responsible for pollution damage, but "UMTC shall have the exclusive right to tow all barges covered by this Agreement." Cook guaranteed "unconditionally and absolutely" the "agreements" and "obligations" of C.T.S. "as if [it] were an original party."

The explosion happened some yards away from the water and the dock,[1] where the barge had been spotted. Bayside is a wholly owned subsidiary of Cook, as is C.T.S. The tugboat which brought Barge CKI–388 to the Pillsbury dock at Memphis had departed the scene on May 22, 1974.

## STIPULATION OF VALUE

■ Value of complainant's interests in Barge CKI–388 and freight thereon at the time of the explosion was asserted to be $45,000 based on affidavits filed in support thereof. No claimant has challenged this valuation, but several have maintained that the value of the towboat ought to also be included. There is, however, no basis for this contention; the barge was a separate and independent vessel and was not a part of the towboat which had departed the scene at the time of the explosion. *In Re American Commercial Lines*, 353 F.Supp. 872 (E.D.Ky.1973). Complainants have submitted a correct stipulation of value at $45,-000. See *In Re Midland Enterprises*, 296 F.Supp. 1356 (S.D.Ohio, 1968).

## ADMIRALTY—MARITIME JURISDICTION

Section 740 of the Admiralty Jurisdiction Act, which was extended in 1948, provides:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

■ This extension of maritime jurisdiction declares injuries on land "to be maritime torts if caused by a vessel on navigable waters." *Nacirema Co. v. Johnson*, 396 U.S. 212, 222, 90 S.Ct. 347, 353, 24 L.Ed.2d 371 (1969). See *State of California v. S.S. Bournemouth*, 307 F.Supp. 922, 925 (C.D. Cal., 1969); *Gebhard v. S.S. Hawaiian Legislator*, 425 F.2d 1303, 1309 (9th Cir., 1970). The result is that " 'ship to shore' torts now have a new form of relief available in admiralty." *State of California v. Bournemouth, supra*, p. 925. Perhaps the leading case on this question, however, is *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1962). Jurisdiction under admiralty was held to apply where a longshoreman working on a dock in unloading a ship slipped on spillage from cargo that had been negligently stored and packed and had spilled during the unloading process:

"We think it sufficient for the needs of this occasion to hold that the case is within the maritime jurisdiction under 46 USC, Section 740 when, as here, it is alleged that the shipowner commits a tort while or before the ship is being unloaded, and the impact of which is felt ashore at a time and place not remote from the wrongful act." 373 U.S. at 210, 83 S.Ct. at 1188.

See also to this same effect, *Burrage v. Flota Mercante S.A.*, 431 F.2d 1229 (5th Cir., 1970). *Gutierrez v. Waterman, supra*, was interpreted in *Gebhard v. S.S. Hawaiian Legislator, supra*, at page 1306 as not

---

1. According to the memorandum of J. C. Cain, a claimant, it occurred approximately 300 feet from the barge on the Mississippi River (on McKellar Lake).

limiting maritime jurisdiction to injuries on land to those "actually caused by the physical agency of the vessel or a particular part of it." Furthermore, at page 1307 of that latter decision, the Court held that maritime jurisdiction extends "to all claims arising out of a vessel-caused injury, regardless of the parties sought to be charged." See also *Huser v. Santa Fe Pomeroy, Inc.*, 513 F.2d 1298 (9th Cir., 1975). The wrong, however, regardless of where it occurs, to come under admiralty jurisdiction must "bear a significant relationship to traditional maritime activity." *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). See *St. Hilaire Moye v. Henderson*, 496 F.2d 973, 979 (8th Cir., 1974).

■ It would appear that complainants have made out a case, subject to development of further proof, that injuries and damages asserted by claimants bear a significant relationship to maritime activities, *i. e.* the loading, transporting, and unloading of a "waterborne transportation device," Barge CKI–388. Further, it appears that the explosion, allegedly resulting from negligently conducted maritime activity, occurred in the process of unloading and weighing the cargo in question and happened at a point adjacent to the dock, not too remote from the navigable waters, the Mississippi River.

■ A reasonable construction of claimant's assertions in their various suits relate directly to activities on the barge; allowing grain with foreign objects to be loaded upon it, allowing grain to be shipped in an unclean and unfit barge; failure to advise the designee of shipment as to the defective or dangerous nature of cargo, and negligent shipment and barge condition, generally. Under the rationale, then, of *Gutierrez v. Waterman, supra,* and progeny, admiralty and maritime jurisdiction applies to this "ship to shore" type of tort regardless of the fact that injury occurred on land. Loading and unloading of cargo are traditionally considered as "work of the sea". *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *Brisco v.*

*American President Lines,* 325 F.Supp. 1259, 1261 (N.D.Cal., 1970).

There may be other assertions of liability against complainants in the State Court suits filed by claimants, but to the extent their claims relate directly and substantially to asserted negligence in loading grain upon and unloading grain from the barge in question and the transportation of the grain upon the barge and the condition of the barge, the owner and those standing in an ownership position, a bareboat charterer, may seek exoneration and limitation of liability.

■ "The legislative history of the Extension Act itself makes it abundantly clear that Congress in drafting the Extension Act, was merely extending the traditional admiralty jurisdiction to include damage occasioned by a vessel situated on navigable waters to person or property situated upon land, such causes of action theretofore having been maintainable only on the common law side." *Johnson v. Traynor,* 243 F.Supp. 184, 192 (D.Md., 1965).

## NATURE OF THE CHARTER

■ Under the principles enumerated, limitation as to the losses asserted may be claimed by UMTC by virtue of its ownership of the barge. 46 U.S.C. § 183. *American Car & Foundry Co. v. Brassert,* 289 U.S. 261, 53 S.Ct. 618, 77 L.Ed. 1162 (1933). The statute here involved "has long been construed to embrace maritime as well as non-maritime claims," including shipowners' insurance, *Guillot v. Cenac Towing Co.,* 366 F.2d 898, 904 (5th Cir., 1966), by reason of the maritime "nature of the occurrence," and so long as damages were "occasioned by a vessel."

■ A demise or bareboat charterer may, then, also rely upon the limitation act in the same fashion as the owner. *Spooner & Son v. Conn. Fire Ins. Co.,* 206 F.Supp. 495, 507 (S.D.N.Y., 1962). The Limitation Act, Sec. 186, "unamended since 1851, provides that a charterer who shall 'man, victual and navigate' the vessel, 'at his own expense, or by his own procurement' shall be deemed an

'owner' within the meaning of the act." Gilmore & Black, *The Law of Admiralty*, (1957) Chapter X, Page 673. The authors proceed to point out that "this means that so-called bareboat or demise charterers may limit but that time charters under the usual arrangement may not." (Sec. 10–10). This is further explained by the same authors in Sec. 10–28: 'The time charterer or the voyage charterer, where the owner continues to man, victual and navigate the vessel, may not limit." The claimants argue that neither C.T.S. nor Cook may claim the status of owner under the particular charter arrangement here involved.

"The demise, in practical effect and in important legal consequence, shifts the possession and control of the vessel from one person to another, just as the shoreside lease of real property shifts many of the incidents of ownership from lessor to lessee." Gilmore & Black, *supra*, Chapter IV, page 215. Then, the authors proceed to discuss typical characteristics of a demise or bareboat charterer. "The test is one of 'control', if the owner retains control over the vessel, merely carrying the goods furnished or designated by the charter, the charter is not a demise." (Sec. 4–21). Put another way, "to create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command and navigation' thereof to the demisee", *Guzman v. Pichirilo*, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962), and further "it is therefore tantamount to, though just short of, an outright transfer of ownership." 369 U.S. at 700, 82 S.Ct. at 1096. That case, moreover, states that "courts are reluctant to find a demise when the dealings between the parties are consistent with a lesser relationship." See *Reed v. United States*, 11 Wall. 591, 601, 20 L.Ed. 220 (1871).[2] The words "demise" or "bareboat" are not used in the charter agreement in controversy, although no technical words are absolutely necessary to create a demise.

Other characteristics of a demise arrangement, however, are present here. The owner furnished a vessel in seaworthy state at the outset, and C.T.S. was to return it in good condition, except for normal wear and tear; survey was provided for (see Gilmore & Black, *supra*, Sec. 4–22). Responsibility for providing insurance was also covered as in a typical demise situation. Some indicia of a kind of title transfer, moreover, was made on the barge—letters were changed from "UM 388" to "CKI–388" "for the convenience of the parties," the costs being equally divided. Though a vessel, the barge itself would be manned by very limited personnel, so it would not be expected that much thought would have been given to "manning" or "victualing" the barge, but there was some at least indirect reference to "navigating". That reference was to the exclusive right of UMTC in towing the barge; thus, UMTC could direct the navigation even though for the account of and under the general instruction of C.T.S. While so towing, C.T.S.'s indemnification liability would not apply. Also, UMTC retained the right to arrange for all necessary maintenance and cleaning for the barge during the term, the cost of maintenance to be borne one-half (½) by each. This would indicate a continuing recognition of its interest in and indirect control over maintenance (and cleaning) by the owner at least to some degree, since it would bear one-half (½) the cost thereof.

Since the burden is upon each complainant to establish its right to exoneration and/or limitation, (and no provision of the towing agreement between C.T.S. and UMTC that would indicate an outright transfer or a complete and exclusive relinquishment of control has been called to our attention), this Court holds that C.T.S., as a charter party, has failed to carry its burden of showing that it is entitled to the extraordinary maritime relief applicable to a de-

---

2. At page 591, it is said:

"Unless the ship herself is let to hire, and the owner parts with possession and command *and navigation* of the same, the charterer is not to be regarded as the owners . . . . courts of justice are not inclined to regard the contract as a demise . . . if *the end in view can conveniently be accomplished without the transfer of the vessel* . . . . " (emphasis ours)

mise charterer. Cook, as an unconditional guarantor, stands in a somewhat different position than C.T.S., but it can claim no better position as to limitation than its subsidiary, C.T.S. See *Flink v. Paladini*, 279 U.S. 59, 49 S.Ct. 255, 73 L.Ed. 613 (1929) and *In Re Petition of United States*, 259 F.2d 608, 610 (3d Cir., 1958).

This Court is mindful that circumstances pertaining to a barge without an independent power source may differ from that of a vessel with its own means of propulsion. Some courts have indicated that charter of a barge without power is, in fact, a demise. See *R. Lenahan*, 48 F.2d 110 (2nd Cir., 1931); *Ira S. Bushey & Sons v. Hedger & Co.*, 40 F.2d 417 (2nd Cir., 1930);[3] *The Nat E. Sutton*, 42 F.2d 229 (E.D.N.Y., 1930); *Moran Towing v. City of New York*, 36 F.2d 417 (S.D.N.Y., 1929); *Dailey v. Carroll*, 248 F. 466 (2nd Cir., 1917); *The Daniel Burns*, 52 F. 159 (S.D.N.Y., 1892). These cases and their holdings are noted in *The Doyle*, 105 F.2d 113, 114 (3rd Cir., 1939), but in the latter case which held a barge charterer to become the "owner pro hac vice", it was important that the charterer was a towing company with the right of and in the exercise of navigation of the barge, which caused damage to its cargo. (Its liability was held, however, to be less than the owners). *R. D. Wood Co. v. Phoenix Steel Corp.*, 211 F.Supp. 924, 927 (E.D. Pa., 1962) also comments on the latter aspect of *Doyle*, observing that " . . . the towing company had clearly taken over *complete control of the vessel* and was, therefore, correctly treated as the owner." It was also observed, moreover, that there was "some indication that peculiar conditions at New York" required the second circuit rule pertaining to barge charters. It is concluded that whether or not the charter in controversy here is or is not a demise depends upon the facts of the case in light of effective control of the vessel and the

charter provisions. *Leary v. United States*, 14 Wall. 607, 610, 20 L.Ed. 756 (1872).[4] Where the charterer receives, in effect, only the *service* of a vessel (the word "use" is employed in *Leary*) without entire possession and control, it is less than a demise. *United States v. Shea*, 152 U.S. 178, 188, 14 S.Ct. 519, 38 L.Ed. 403 (1894).

The Court here has made a determination with regard to the right of C.T.S. and Cook to limit liability under the circumstances evident at a hearing preliminary to one on the merits under circumstances here indicated. The question is certainly not one free of doubt. See *In Re Midland, supra; J. Ray McDermott v. Hunt Oil*, 262 F.2d 127 (5th Cir., 1959). Judgment will be entered for claimants (defendants) on their motions as to C.T.S. and Cook, but an order similar in form to that requested by UMTC will likewise be entered, thereby overruling these motions as to UMTC.

---

**3.** This case makes note that barges are essentially subject to control and direction of the tug. Of course, in the instant case, UMTC retains this control.

**4.** This case also specifies the difference between a demise and a time charter; the latter occurs when the charter lets "only the *use* of the vessel, the owner at the same time retaining its command and possession and control over its navigation." (emphasis ours).